1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                   MARSHALL DIVISION

3   NINGDE AMPEREX TECHNOLOGY,     )  CAUSE NO. 2:22-CV-232-JRG
    LIMITED,                       (
4                                  )
          Plaintiff,               (
5                                  )
    vs.                            (
6                                  )
    ZHUHAI COSMX BATTERY CO., LTD.,(  MARSHALL, TEXAS
7                                  )  FEBRUARY 8, 2024
          Defendant.              )  8:00 A.M.
8   _____

9
                           VOLUME 6
10

11  _____

                      TRIAL ON THE MERITS
12

            BEFORE THE HONORABLE RODNEY GILSTRAP
13           UNITED STATES CHIEF DISTRICT JUDGE
                         and a jury
14  _____

15

16

17

18

19

20

21

22             SHAWN McROBERTS, RMR, CRR
                 100 E. HOUSTON STREET
23              MARSHALL, TEXAS  75670
                    (903) 923-8546
24         shawn_mcroberts@txed.uscourts.gov

25

1                          A P P E A R A N C E S

2        FOR THE PLAINTIFFS:    QUINN EMANUEL URQUHART &
                                SULLIVAN, LLP - REDWOOD
3                               555 TWIN DOLPHIN DRIVE
                                5TH FLOOR
4                               REDWOOD SHORES, CA 94065
                                (650) 801-5000
5                               BY: MR. MICHAEL POWELL

6                               QUINN EMANUEL URQUHART &
                                SULLIVAN, LLP
7                               865 S. FIGUEROA STREET
                                LOS ANGELES, CA 90017
8                               (213) 443-3000
                                BY:  MR. ADAM WOLFSON
9                                    MR. LANCE YANG

10                              QUINN EMANUEL URQUHART &
                                SULLIVAN, LLP
11                              1109 FIRST AVENUE, SUITE 210
                                SEATTLE, WASHINGTON  98101
12                              (206) 905-7000
                                BY:  MS. CHUNMENG YANG
13
                                MANN, TINDEL, THOMPSON
14                              112 E. LINE STREET, SUITE 304
                                TYLER, TEXAS  75702
15                              (903) 657-8540
                                BY:  MR. BLAKE THOMPSON
16
         FOR THE DEFENDANTS:    NORTON ROSE FULBRIGHT, US, LLP
17                              1301 MCKINNEY, SUITE 5100
                                HOUSTON, TEXAS  77010
18                              (713) 651-5151
                                BY:  MR. LAYNE KRUSE
19
                                FINNEGAN HENDERSON FARABOW
20                              GARRET DUNNER, LLP
                                901 NEW YORK AVENUE, NW
21                              WASHINGTON, DC 20001
                                (202) 408-4216
22                              BY:  MR. DANIEL KLODOWSKI
                                     MR. QINGYU LIN
23

24

25

```
 1                              FINNEGAN HENDERSON FARABOW
                                GARRET DUNNER, LLP
 2                              3300 HILLVIEW AVE.
                                PALO ALTO, CA 94304
 3                              (650) 849-6626
                                BY:  MS. YANYI LIU
 4
                                NORTON ROSE FULBRIGHT, US, LLP
 5                              799 9TH ST. NW., SUITE 1000
                                WASHINGTON, DC 20001
 6                              (240) 535-1412
                                BY:  MS. MARISA MADARAS
 7                              FINNEGAN HENDERSON FARABOW
                                GARRETT & DUNNER, LLP-DC
 8                              901 NEW YORK AVE, NW
                                WASHINGTON, DC 20001
 9                              (202) 408-4110
                                BY:  MR. GERALD IVEY
10                                   MR. JEFFREY TOTTEN
                                     MS. DEENA LANIER
11                                   MR. JAMES BARNEY

12                              NORTON ROSE FULBRIGHT, US, LLP
                                HOUSTON
13                              1301 MCKINNEY, SUITE 5100
                                HOUSTON, TEXAS  77010-3095
14                              (713) 651-6652
                                BY:  MR. DARRYL ANDERSON
15
                                FINDLAY CRAFT, P.C.
16                              7270 CROSSWATER AVENUE
                                SUITE B
17                              TYLER, TEXAS  75703
                                (903) 534-1100
18                              BY:  MR. ERIC FINDLAY

19         OFFICIAL REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                100 E. HOUSTON STREET
20                              MARSHALL, TEXAS  75670
                                (903) 923-8546
21

22

23

24

25
```

1    THE COURT:  Be seated, please.

2    Counsel, before we turn to the charge and verdict form,

3    let me ask, were there items from the list of pre-admitted

4    exhibits used for the first time during the trial yesterday

5    and are you prepared to read those exhibits into the record at

6    this time should that have been the case?  I don't want to

7    overlook this.  If you're not ready for some reason, tell me.

8    MR. FINDLAY:  I think it's the latter, Your Honor.

9    I apologize.  I'll confer with Mr. Thompson, and we'll get it

10   straightened out.

11   THE COURT:  We'll take this up before we bring the

12   jury in later this morning.

13   MR. FINDLAY:  Yes, sir.

14   THE COURT:  All right.  Then let's turn to the final

15   jury instructions and the verdict form.  I'll note for the

16   record that at the end of the evidence yesterday, the Court

17   released the jury until this morning.

18   During that interval, the Court heard lengthy arguments

19   regarding various motions for relief under Rule 50(a) of the

20   Federal Rules of Civil Procedure.  The Court ruled on those

21   various requests.  The Court carried one issue from the 50(a)

22   practice yesterday, and that was with regard to the asserted

23   counterclaims under the California extortion statute.

24   I am going to, with regard to that particular statute,

25   the Defendants -- well, with regard to that particular

1 statute, there was argument at the 50(a) stage regarding the

2 applicability and propriety of that portion of the

3 counterclaim brought by the Defendants. And having considered

4 that matter carefully overnight, I'm going to grant 50(a)

5 relief, excluding the counterclaim portion under the

6 California statute and find that, based on the

7 extraterritoriality issues, that it should not be and is not

8 appropriate as a part of this action.

9 There is clear state law authority from the state of

10 California which has also been adopted by the U.S. District

11 Courts and various districts in that state that there must be

12 a nexus with the state of California. There's no evidence

13 that I can find in this record before this jury that

14 establishes such a nexus or overcomes the presumption that the

15 enforcement of that statute should be limited to the state of

16 California.

17 So I'm going to not submit any issues, either

18 instructions or questions, to the jury on the California

19 statute. And I'm going to rule in CounterDefendant

20 Plaintiff's favor with regard to that issue pursuant to Rule

21 50(a).

22 Now, having done that, after the completion of the 50(a)

23 motion practice yesterday, the Court conducted an informal

24 charge conference with counsel in chambers where we undertook

25 a lengthy discussion of the final jury instructions and

1 verdict form as they then were constituted.

2      The Court reviewed multiple portions of the parties'

3 submission when they were not in agreement, heard fully from

4 each side, and had an opportunity to query counsel with regard

5 to any issues, agreed or disagreed, within those documents

6 where the Court if he would input would be helpful.

7      The Court reviewed the input from the parties, the

8 Court's reviewed overnight various authorities cited by the

9 parties for their competing positions, and the Court has now

10 generated what it believes to be the proper and appropriate

11 final jury instruction and verdict form for submission in this

12 case to this jury under this record.

13      And I've provided those documents to counsel for the

14 parties earlier this morning with an opportunity to review and

15 consider the same, and I now intend to conduct a formal charge

16 conference on the record where either party may lodge whatever

17 objections to the charge or verdict form that they believe are

18 supported by the law and necessitated by the interests of

19 their respective clients.

20      So with that, counsel, and as I discussed with you

21 yesterday, whoever's going to speak for Plaintiff and

22 whoever's going to speak for Defendant, if those two

23 individuals would go to the podium, we'll begin with the final

24 jury instructions and we will walk through that document

25 orally on a page-by-page basis.

1    And at any point along the way as we cover the material

2    page by page, if you have an objection to make as to something

3    you believe should not have been included or something that

4    you believe should not have been omitted, then you're free to

5    make those objections on the record.

6    So whoever's going to speak for the respective parties,

7    please go to the podium.  And I really don't care if it's two

8    people or more than two people as long as we have one person

9    speaking for Plaintiff and one person speaking for Defendant.

10   I understand there's been an allocation of authority

11   between counsel with regard to the patent issues and the

12   antitrust issues, so it is not limited to two people only.

13   It's limited to one person per side as we go through the

14   process.

15   So with that, I'll turn to the final jury instructions,

16   beginning on the cover page or page 1.  Is there objection

17   here from either Plaintiff or Defendant?

18   MS. YANG:  Not from Plaintiff.

19   MR. TOTTEN:  Good morning, Your Honor.  Not from

20   Defendant.

21   THE COURT:  Turning then to page 2 of the final jury

22   instructions, is there objection here from either party?

23   MS. YANG:  No.

24   MR. TOTTEN:  No, Your Honor.

25   THE COURT:  Next is page 3, is there objection here?

1    MS. YANG:  No objection.

2    MR. TOTTEN:  No, Your Honor.

3    THE COURT:  Next is page 4.  Is there any objection?

4    MS. YANG:  No objection.

5    MR. TOTTEN:  No, Your Honor.

6    THE COURT:  Page 5, is there any objection?

7    MS. YANG:  No.

8    MR. TOTTEN:  No, Your Honor.

9    THE COURT:  Page 6, is there any objection?

10   MS. YANG:  No objection.

11   MR. ANDERSON:  Yes, Your Honor.  Defendant has an

12   objection on page 6.

13   THE COURT:  State your objection.

14   MR. ANDERSON:  The objection is to the -- the

15   sentence that begins on page 6 and continues on the top of

16   page 7, imposing a burden of proof of clear and convincing

17   evidence in connection with the Noerr-Pennington claim.  We

18   believe the correct standard is the preponderance of the

19   evidence standard, so we object on that basis.

20   THE COURT:  All right.  That objection is overruled.

21   Anything further on page 6?

22   If not, we'll turn to page 7.  Are there any objections

23   here?

24   MS. YANG:  No objection.

25   MR. TOTTEN:  No objection.

1     MR. ANDERSON:  Only that the sentence continues over

2  to page 7.

3          THE COURT:  Duly-noted.  That being the case, I'll

4  turn to page 8 of the final jury instructions.  Are there

5  objections here from either party?

6          MS. YANG:  No objection.

7          MR. TOTTEN:  No, Your Honor.

8          THE COURT:  Page 9, any objections?

9          MS. YANG:  No objection.

10         MR. TOTTEN:  No, Your Honor.

11         THE COURT:  Page 10, any objections?

12         MS. YANG:  No objection.

13         MR. TOTTEN:  No, Your Honor.

14         THE COURT:  Page 11, any objections?

15         MS. YANG:  Yes, Your Honor.  Plaintiff would like to

16  lodge an objection due to the omission of the curative claim

17  construction regarding the '352 Patent in view of the expert

18  testimony regarding the definition of the term 'corresponding'

19  portion rendered by CosMX's expert witness.

20         THE COURT:  All right.  That objection is overruled.

21  Anything further on page 11?

22         MR. TOTTEN:  Not from Defendant, Your Honor.

23         THE COURT:  Anything further here from Plaintiff?

24         MS. YANG:  Nothing.

25         THE COURT:  Then we'll turn to page 12.  Is there

1  any objection here?

2          MS. YANG:  No objection.

3          MR. TOTTEN:  No, Your Honor.

4          THE COURT:  Next is page 13.  Any objection?

5          MS. YANG:  No objection.

6          MR. TOTTEN:  No, Your Honor.

7          THE COURT:  Next is page 14.  Any objection?

8          MS. YANG:  No objection.

9          MR. TOTTEN:  No objection, Your Honor.

10          THE COURT:  Next is page 15.  Is there any

11  objection?

12          MS. YANG:  No objection.

13          MR. TOTTEN:  No, Your Honor.

14          THE COURT:  Page 16, any objection?

15          MS. YANG:  None, Your Honor.

16          MR. TOTTEN:  No, Your Honor.

17          THE COURT:  Page 17, any objection?

18          MS. YANG:  Yes, Your Honor.  Plaintiff objects on

19  the basis that -- at the very bottom when we go into the

20  discussion of prior art, we object to the extent that there is

21  no instruction on the corroboration requirement of oral

22  testimony regarding the priority date for the alleged prior

23  art system.

24          THE COURT:  All right.  That objection is overruled.

25  Anything from either party on page 17?

 1          MR. TOTTEN:  No, Your Honor.

 2          MS. YANG:  No, Your Honor.

 3          THE COURT:  Turning to page 18, are there any

 4     objections here?

 5          MS. YANG:  No objection.

 6          MR. TOTTEN:  No, Your Honor.

 7          THE COURT:  Page 19, are there any objections?

 8          MS. YANG:  No objection.

 9          MR. TOTTEN:  There is a minor typographical error in

10     the last paragraph, Your Honor.  CosMX contend should be CosMX

11     contends.  Other than that, no objection.

12          THE COURT:  All right.  I see that and I will

13     correct that typographical error.

14        Turning then to page 20, are there any objections here?

15          MS. YANG:  No objection.

16          MR. TOTTEN:  No, Your Honor.

17          THE COURT:  Next is page 21, any objections?

18          MS. YANG:  No objection.

19          MR. TOTTEN:  No, Your Honor.

20          THE COURT:  Page 22, any objections?

21          MS. YANG:  No objection.

22          MR. TOTTEN:  No, Your Honor.

23          THE COURT:  Page 23, any objections?

24          MS. YANG:  No objection.

25          MR. TOTTEN:  No, Your Honor.

1    THE COURT:  Page 24, any objections?

2    MS. YANG:  No objection.

3    MR. TOTTEN:  No, Your Honor.

4    THE COURT:  Page 25, any objections?

5    MS. YANG:  No objection.

6    MR. TOTTEN:  No, Your Honor.

7    THE COURT:  Page 26, any objections?

8    MS. YANG:  No objection.

9    MR. TOTTEN:  No, Your Honor.

10   THE COURT:  All right.  Pages 25 and 26 contain all

11   15 of the *Georgia-Pacific* factors.  I gather by your decisions

12   not to object to those two pages, that neither party objects

13   to the jury being charged on all 15 of those factors.  Is that

14   correct?

15   MS. YANG:  That is correct, Your Honor.

16   MR. TOTTEN:  Correct, Your Honor.

17   THE COURT:  Okay.  Anything on page 26 before we go

18   further?

19   MS. YANG:  Nothing.

20   MR. TOTTEN:  No, Your Honor.

21   THE COURT:  I'll turn to page 27.  Any objections

22   here?

23   MS. YANG:  No objection.

24   MR. TOTTEN:  No, Your Honor.

25   THE COURT:  Page 28, any objections?

1        MS. YANG:  No objection.

2        MR. ANDERSON:  Your Honor, Defendant has an

3    objection on page 28.

4        THE COURT:  State your objection.

5        MR. TOTTEN:  We have two objections.  One is the

6    objection I mentioned earlier about the clear and convincing

7    evidence burden of proof.  I believe, as I mentioned, that the

8    burden should be preponderance of the evidence.

9    And then, secondly, we object to the submission to the

10   jury of an instruction on objective baselessness.  We believe

11   that the appropriate *Noerr* instruction in this case is that --

12   is the test that omits objective baselessness based on cases

13   such as USS POSCO Industries versus Contra Costa County

14   Building and Construction Trades Council, 31 F.3d 800, 9th

15   Circuit 1994.  And so I don't know if the Court wants me to

16   identify specific sentences, but those are the two objections

17   to this --

18       THE COURT:  We had a lengthy discussion over this

19   issue.  As a matter of fact, we had a lengthy discussion of

20   both issues you raise here in the informal charge conference.

21   And the Court's reviewed the competing authorities submitted

22   by the parties and considered this carefully, and I note your

23   objections in both regards, but they're both overruled.

24   Turning then to page 29, are there objections here from

25   either party?

1       MS. YANG:  No objection.

2       MR. ANDERSON:  Your Honor, we object to the first

3  sentence on page 29 on the grounds already indicated, that

4  first half of that sentence is a restatement of the objective

5  baselessness test.

6       THE COURT:  All right.  That's overruled.  Anything

7  further on page 29?

8       MR. ANDERSON:  Not from Defendant.

9       THE COURT:  Then we'll turn to page 30 of the final

10  jury instructions.  Are there objections here from either

11  party?

12       MS. YANG:  No objection.

13       THE COURT:  Defendant?

14       MR. ANDERSON:  I'm sorry.  No objection, Your Honor.

15       THE COURT:  Then we'll turn to page 31.  Any

16  objections here?

17       MS. YANG:  No objection.

18       MR. ANDERSON:  Your Honor, Defendant has an

19  objection on page 31.

20       THE COURT:  State your objection.

21       MR. ANDERSON:  The objection is to the omission of

22  an instruction on the impact of -- on the effect of a no-poach

23  agreement on anti-competitive conduct, the fact that that

24  would be a per se violation such that harm to competition

25  would be presumed, and we believe that issue as an accurate

1 statement of the law and should be given to the jury to inform

2 their analysis of anti-competitive conduct.

3        THE COURT:  That objection is overruled.  Anything

4 further on page 31?

5        MR. ANDERSON:  No, Your Honor.

6        THE COURT:  Turning then to page 32, are there any

7 objections here?

8        MS. YANG:  No objection.

9        MR. ANDERSON:  No objection.

10        THE COURT:  Page 33, are there any objections?

11        MS. YANG:  No objection.

12        MR. ANDERSON:  No objection.

13        THE COURT:  Page 34, any objections?

14        MS. YANG:  No objection.

15        MR. ANDERSON:  No objection.

16        THE COURT:  Page 35, any objections?

17        MS. YANG:  No objection.

18        MR. ANDERSON:  No objection.

19        THE COURT:  Page 36, any objections?

20        MS. YANG:  No objection.

21        MR. ANDERSON:  Your Honor, on page 36, Defendant

22 objects to the word 'significant' in the second full

23 paragraph, if you find that ATL had the specific intent to

24 achieve monopoly power in a relevant market and engaged in

25 significant anti-competitive conduct.  We don't believe there

1  is any basis in antitrust law for asking the jury to evaluate

2  the degree of anti-competitive conduct.  Anti-competitive

3  conduct is defined in the instructions previously without any

4  reference to them making that type of degreed determination.

5      If the jury concludes that there is anti-competitive

6  conduct, then that satisfies the elements of the antitrust

7  claim, and this instruction with that word we think confuses

8  the issue.

9          THE COURT:  All right.  Out of an abundance of

10  caution, I'm going to sustain that objection and I'll remove

11  the word 'significant'.  Anything further on page 36 from

12  either party?

13          MR. ANDERSON:  No, Your Honor.

14          THE COURT:  Turning then to page 37, any objections

15  here?

16          MS. YANG:  Your Honor, Plaintiff would like to

17  reserve the objection to the extent discussion regarding the

18  10 percent, 20 percent, 50 percent market shares are

19  inconsistent with case law.

20          THE COURT:  All right.  You said you'd like to

21  reserve the objection.  I assume you're making the objection.

22          MS. YANG:  Sorry.  Yes.

23          THE COURT:  All right.  Well, that objection is

24  overruled.  Anything further on page 37?

25          MR. ANDERSON:  No, Your Honor.

1    THE COURT:  All right.  Turning then to page 38, any

2    objections here from either party?

3    MS. YANG:  No objection.

4    MR. ANDERSON:  No objection.

5    THE COURT:  Page 39, any objections?

6    MS. YANG:  No objection.

7    MR. ANDERSON:  No objection.

8    THE COURT:  Page 40, any objections?

9    MS. YANG:  No objection.

10   MR. ANDERSON:  No objection.

11   THE COURT:  Page 41, any objections?

12   MS. YANG:  No objections.

13   MR. ANDERSON:  No objection.

14   THE COURT:  Page 42, any objections?

15   MS. YANG:  No objection.

16   MR. ANDERSON:  No objections.

17   THE COURT:  Page 43, any objections?

18   MS. YANG:  No objection.

19   MR. ANDERSON:  No objection.

20   THE COURT:  Page 44, any objections?

21   MS. YANG:  No, Your Honor.

22   MR. ANDERSON:  No objection.

23   THE COURT:  Page 45, any objections?

24   MS. YANG:  No objection.

25   MR. ANDERSON:  No objection.

1      THE COURT:  And last but not least, page 46, any

2  objection?

3      MS. YANG:  No objection.

4      MR. ANDERSON:  No objection.

5      THE COURT:  All right.  Let's turn our attention

6  then to the verdict form.  We'll follow the same approach.

7  Beginning with the cover sheet or page 1 of the verdict form,

8  is there any objection here from either party?

9      MR. WOLFSON:  No objection, Your Honor.

10     MR. TOTTEN:  No objection, Your Honor.

11     THE COURT:  All right.  For absolute certainty in

12  the record, let me just ask you, rather than say no objection,

13  please let me know if it's Plaintiff has no objection or

14  Defendant has no objection.

15     MR. WOLFSON:  No problem.

16     THE COURT:  I don't want any uncertainty.  We'll

17  turn to page 2.  Are there any objections here from either

18  party?

19     MR. WOLFSON:  No objection for the Plaintiff, Your

20  Honor.

21     MR. TOTTEN:  No objection for the Defendant, Your

22  Honor.

23     THE COURT:  Page 3 where there are instructions

24  provided.  Any objections here?

25     MR. WOLFSON:  No objection from the Plaintiff.

1    MR. TOTTEN:  Defendant has no objection, Your Honor.

2    THE COURT:  All right.  Turning then to page 4 where

3    Questions 1a, 1b, and 1c are found, are there objections here?

4    MR. WOLFSON:  No objection from Plaintiff.

5    MR. TOTTEN:  Defendant has no objection, Your Honor.

6    THE COURT:  Turning to page 5 where Question 2 is

7    found, is there objection from either party?

8    MR. WOLFSON:  No objection from Plaintiff.

9    MR. TOTTEN:  Defendant has no objection.

10   THE COURT:  Turning to page 6 of the verdict form

11   where Question 3 is found, is there objection here?

12   MR. WOLFSON:  No objection from Plaintiff.

13   MR. TOTTEN:  Defendant has no objection, Your Honor.

14   THE COURT:  Turning to page 7 where Question 4 is

15   found, is there objection here from either party?

16   MR. WOLFSON:  No objection from plaintiff.

17   MR. TOTTEN:  Defendant has no objection.

18   THE COURT:  Turning to page 8 of the verdict form

19   where Question 5 is found, is there objection here?

20   MR. WOLFSON:  No objection from Plaintiff --

21   MR. ANDERSON:  Your Honor, Defendant objects to the

22   submission of Question No. 5, both on the grounds that the

23   burden of proof we contend is incorrect, and because we do not

24   believe the objective baselessness should be submitted to the

25   jury for all the reasons we previously discussed.

1    THE COURT:  And consistent with the Court's previous

2  rulings, that's overruled.  Turning then to page 9 where

3  Question 6[a] and [b] are located, is there objection here?

4    MR. WOLFSON:  Plaintiff has a limited objection,

5  Your Honor.  Consistent with the previous questions in the

6  verdict form, we believe that this should say, did CosMX,

7  comma, the Defendant, comma, prove by the preponderance of

8  evidence that, and then ATL and so on for the rest of the

9  question.

10    THE COURT:  Defendant have any objection to that?

11  It doesn't seem to be anything other than just a more fulsome

12  expression of what I think both sides agreed to.

13    MR. ANDERSON:  That's correct, Your Honor.  No

14  objection --

15    THE COURT:  All right.  Then I'll make that

16  addition.  And that would cover Questions 6[a] and [b], and I

17  assume, turning to page 10, also Question 6[c] and [d].

18    MR. WOLFSON:  Yes, Your Honor from Plaintiff's

19  perspective.  And in 6[d], I believe it would be, What sum of

20  money, if any, did CosMX prove by preponderance of the

21  evidence would fairly compensate CosMX for the injury, similar

22  to Question No. 4.

23    THE COURT:  All right.

24    MR. ANDERSON:  I think would be worded --

25    MR. WOLFSON:  Oh, yeah, do you find.

1    MR. ANDERSON:  -- do you find CosMX has proven,

2    yeah.

3    MR. WOLFSON:  So the wording would be, Do you find

4    CosMX has proven by a preponderance of the evidence, and then

5    the rest of the question as written.

6    THE COURT:  So Question 6[d], as I understand it,

7    would read, Do you find from a preponderance of the evidence

8    that CosMX has proven what sum of money?

9    MR. WOLFSON:  Yeah.  Let me rephrase that, Your

10   Honor.

11   THE COURT:  That's a little awkward.

12   MR. WOLFSON:  Yeah.  Let me try to read it.  What

13   sum of money, if any --

14   THE COURT:  -- did CosMX prove by a preponderance of

15   the evidence would fairly and reasonably compensate.  I

16   haven't had my cup of coffee this morning.  That seems a

17   better reading to me.

18   MR. WOLFSON:  Yes.  That was our intent in the

19   proposal, Your Honor.

20   THE COURT:  Both sides agree to that?

21   MR. ANDERSON:  Yes, Your Honor.

22   THE COURT:  You agree to that, Mr. Wolfson?

23   MR. WOLFSON:  Yes, Your Honor.  Yes for Plaintiff.

24   THE COURT:  All right.  That is page 10.  Anything

25   else on page 10 before we turn to the final page, page 11?

1    MR. WOLFSON:  Nothing from Plaintiff, Your Honor.

2    MR. ANDERSON:  Defendant has no further objections.

3    THE COURT:  All right.  Any objections on page 11,

4    the final page of the verdict form?

5    MR. WOLFSON:  Nothing from Plaintiff, Your Honor.

6    MR. ANDERSON:  Defendant has no objection.

7    THE COURT:  Okay.  That will complete the formal

8    charge conference.  Thank you, counsel.

9    I will need a little bit of time to make these

10   adjustments.  And as I told the jury earlier, I will prepare

11   and print for them eight individual copies of the final jury

12   instructions for them to have and be able to review while

13   deliberating in the jury room.

14   MR. FINDLAY:  Your Honor?

15   THE COURT:  What is it, Mr. Findlay?

16   MR. FINDLAY:  I'm sorry.  I didn't mean to

17   interrupt, but Mr. Thompson and I have obtained the

18   agreed-upon exhibit list from yesterday.

19   THE COURT:  All right.  Then let's proceed to read

20   those items into the record.

21   MR. FINDLAY:  Exhibits that were used and then now

22   admitted from yesterday:  JTX 1, JTX 3, JTX 18, JTX 37, JTX

23   74, DTX 16, DTX 23, and PTX 3.

24   THE COURT:  All right.  Does Plaintiff have any

25   objection to that rendition?

1    MR. THOMPSON:  No objection, Your Honor.

2    THE COURT:  All right.

3    MR. FINDLAY:  Thank you, Your Honor.

4    THE COURT:  As I told the jury yesterday, I asked

5 them to be prepared to begin at 9:00 this morning.  I'll need

6 the ensuing time to print these copies and have everything

7 ready, but it is my hope and intent to begin as close to 9:00

8 as possible.

9    Are there questions from either side at this juncture

10 before I recess?

11    MR. THOMPSON:  Nothing from Plaintiff, Your Honor.

12    MR. FINDLAY:  No, Your Honor.

13    THE COURT:  Okay.

14    MR. THOMPSON:  I do have one question.

15    THE COURT:  Too late.  Too late.

16    MR. THOMPSON:  Mr. Powell is finishing his closing

17 argument.  Do you expect him to be here at 9:00 or is it all

18 right if he comes in --

19    THE COURT:  No.  I don't want anybody coming in,

20 walking around, or anything else once I start my final

21 instructions.  If he's not here by 9:00, you can present the

22 Plaintiff's closing.  Okay?

23    MR. THOMPSON:  Thank you, Your Honor.  We'll get him

24 here.

25    THE COURT:  If I have to read 46 pages to this jury,

1  he can be here at 9:00.

2      All right.  Court stands in recess.

3          (Brief recess.)

4          THE COURT:  Be seated, please.

5      A couple of matters before I bring in the jury and

6  proceed to give them my final instructions.

7      Number one, I mentioned this to counsel in chambers, but

8  I want to say it one more time for the benefit of everyone

9  present.

10     The Court considers its final instructions to the jury

11 and counsel's closing arguments as the most serious part of an

12 inherently serious process.  Accordingly, I do not want people

13 walking in and out of the courtroom.  I do not want people

14 moving from chair to chair or bench to bench.  I do not want

15 documents and boxes being shuffled around.  In short, I do not

16 want anything that might detract or interfere with the

17 solemnity of this process during my final instructions and

18 counsel's closing arguments.  So if there's anything you need

19 to do that might otherwise be disruptive, do it before I bring

20 the jury in.

21     Also, given the complexity of the counterclaim that's

22 been alleged here as well as the inherent complexity of the

23 patent litigation that forms the gist of Plaintiff's claims,

24 this is a very lengthy final jury instruction I'm going to

25 have to give.

1    I've had three different notes passed to me by a member

2  of the jury during the trial asking for restroom breaks.  What

3  I am intending to do to avoid a problem is at the bottom of

4  page 23 of the final jury instructions, the Court transitions

5  into a beginning discussion of damages.  That's about halfway

6  through the document.  I intend at that juncture to excuse the

7  jury only for about five minutes, and then have them come

8  right back in and take their seats and we'll continue.

9    I am not excusing counsel and I'm not excusing anybody in

10  the gallery, but I am going to try to preempt any problem with

11  that issue by breaking these instructions.  So I'm telling you

12  about that in advance so you won't be surprised.

13    All right.  Is there anything that needs to be presented

14  to the Court from either Plaintiff or Defendant before I bring

15  in the jury and begin the Court's final jury instructions?

16            MR. THOMPSON:  Nothing from Plaintiff, Your Honor.

17            THE COURT:  Anything from Defendant?

18            MR. IVEY:  No, Your Honor.  Thank you.

19            THE COURT:  All right.  Let's bring in the jury.

20            (Whereupon, the jury entered the courtroom.)

21            THE COURT:  Welcome back, members of the jury.

22  Please have a seat.

23    Ladies and gentlemen of the jury, you've heard all the

24  evidence in the case, and I'm now going to instruct you on the

25  law that you must apply.

1    As I told you earlier, you're each going to have your own

2    individual printed copy of these final instructions that I'm

3    giving you orally when you retire to the jury room.  So you

4    are free to make notes if you'd like, but there's no real

5    requirement that you do that.  Part of why I send back a

6    printed copy for each of you is in hopes that you will listen

7    carefully as I give these instructions to you orally, knowing

8    that you can look at your printed copy later if you have

9    questions.

10   Also, because of the competing claims in this case, these

11   are going to be lengthy instructions.  About halfway through,

12   I'm going to break and let the members of the jury retire to

13   the jury room for a few minutes, take care of anything they

14   might need to take care of, and then come right back and we'll

15   continue.  Otherwise, you might be seated for two to three

16   hours without a break.

17   After I give you these instructions orally, counsel for

18   the competing parties will present their closing arguments to

19   you.

20   Now, it's your duty to follow the law as I give it to

21   you.  On the other hand and as I've said, you, the jury, are

22   the sole judges of the facts.  Do not consider any statement

23   that I have made over the course of the trial or may make in

24   the course of these instructions as an indication to you that

25   I have an opinion about the facts in this case.

1    You are about to hear closing arguments from the

2 attorneys for the competing parties.  Statements and arguments

3 of the attorneys are not evidence, ladies and gentlemen, and

4 they are not instructions on the law.  They are intended only

5 to assist you, the jury, in understanding the evidence and the

6 parties' competing contentions.

7    A verdict form has been prepared for you, and you'll take

8 this verdict form with you to the jury room when you retire.

9 And when you've reached a unanimous agreement as to your

10 verdict, you will have your foreperson fill in the blanks in

11 the verdict form reflecting those unanimous agreed answers,

12 your foreperson will then date and sign the verdict form on

13 the last page, and you are then to notify the Court Security

14 Officer you've reached a verdict.

15    Answer the questions in the verdict form from the facts

16 as you find them to be.  Do not decide who you think should

17 win this case and then answer the questions to reach that

18 result.  Again, your answers and your verdict must be

19 unanimous.

20    In determining whether any fact has been proven in this

21 case, you may, unless otherwise instructed, consider the

22 testimony of all the witnesses regardless of who may have

23 called them.  You may consider any stipulations of the

24 parties, and you may consider all the exhibits that have been

25 received and admitted into evidence over the course of the

1    trial, regardless of who may have introduced them.

2         You, the jury, are the sole judges of the credibility and

3    believability of all the witnesses and the weight and effect

4    to give to all the evidence.  Now, in deciding the facts in

5    this case, you may have to decide which testimony to believe

6    and which testimony not to believe.  You alone are to

7    determine the questions of credibility or truthfulness of the

8    witnesses.

9         In weighing the testimony of the witnesses, you may

10   consider the witness' manner and demeanor on the witness

11   stand, any feelings or interest the witness may have in the

12   outcome of the case, any prejudice or bias that the witness

13   may have, and the consistency or inconsistency of their

14   testimony, considered in the light of the circumstances.  Has

15   the witness been contradicted by other evidence?  Has he or

16   she made statements at other times and in other places

17   contrary to what they said on the witness stand?  You, ladies

18   and gentlemen, must give the testimony of each witness the

19   amount of credibility that you think it deserves.

20        You must also keep in mind that a simple mistake does not

21   mean that a witness is intentionally not telling the truth.

22   You must consider whether any misstatement was an intentional

23   falsehood or a simple lapse in memory and what significance,

24   if any, should be attached to that testimony.

25        As I've previously told you, the attorneys in this case

1    act as advocates for their competing clients, and the

2    attorneys have a duty to raise objections when they believe

3    evidence is offered during the trial that should not be

4    admitted under the rules of the Court.

5         When the Court sustained an objection to a question

6    addressed to the witness, you must disregard the question

7    entirely, and you may draw no inference from its wording or

8    guess or speculate about what the witness would have said if

9    he or she had been permitted to answer the question.

10        On the other hand, if the objection was overruled by the

11   Court, then you must treat the answer to that question just as

12   you would treat any other answer to any other question as if

13   no objection had been made.  And by allowing the testimony or

14   other evidence to be introduced over the objection of an

15   attorney, the Court did not, in so doing, indicate any opinion

16   as to the weight or effect of the evidence.  Again, that's a

17   decision for you to make.

18        Now, at various times during the trial it's been

19   necessary for the Court to talk with the attorneys outside of

20   your hearing, either by having a conference here at the bench

21   or by calling a recess and talking to them while you were

22   outside of the courtroom.  This happens during a trial like

23   this because there are things that arise that do not involve

24   the jury.  You should not speculate or guess about what was

25   said during any discussions that took place outside of your

1    presence.

2        Now, there are two types of evidence that you may

3    consider in properly finding the truth as to the facts in this

4    case.  One is direct evidence, such as the testimony of an

5    eyewitness.  The other is indirect or circumstantial evidence,

6    that is, the proof of a chain of circumstances that indicates

7    the existence or non-existence of certain other facts.  As a

8    general rule, the law makes no distinction between direct

9    evidence or circumstantial evidence, but simply requires that

10   you find the facts based on all the evidence presented, both

11   direct and circumstantial.

12       Now, it's possible that the parties have stipulated or

13   agreed to some facts in the case.  When lawyers for both sides

14   stipulate or agree as to the existence of a fact, then you

15   must, unless otherwise instructed, accept the stipulation as

16   evidence and regard the fact as proven.

17       These facts, ladies and gentlemen, are not disputed

18   between the parties, and they are:

19       1.  The subject matter jurisdiction in this Court is

20   proper.

21       2.  The parties do not contest that the Court has

22   personal jurisdiction over the parties for the purpose of this

23   litigation.

24       3.  On May the 10th, 2022, the United States Patent and

25   Trademark Office issued Patent No. 11,329,352, entitled

Secondary Battery Cell and Winding Formation System Thereof.

4.   The effective date of the '352 Patent is August the 31st, 2015.

5.   ATL, the Plaintiff, owns all the right, title, and interest in and to the '352 Patent.

6.   ATL first notified CosMX, the Defendant, of its allegation regarding infringement of the '352 Patent on June the 21st, 2022.

7.   On November the 10th, 2020, the United States Patent and Trademark Office issued U.S. Patent No. 10,833,363, entitled Electrolyte and Electrochemical Device.

8.   The effective filing date of the '363 Patent is September the 21st, 2018.

9.   Plaintiff ATL owns all the right, title, and interest in and to the '363 Patent.

10.   ATL first notified Defendant CosMX of its allegation regarding infringement of the '363 Patent on August the 2nd, 2022.

11.   On March the 30th, 2021, the U.S. Patent and Trademark Office issued U.S. Patent No. 10,964,987, titled Separator and Energy Storage Device.

12.   The effective filing date of the '987 Patent is April the 11th, 2018.

13.   Plaintiff ATL owns all right, title, and interest in and to the '987 Patent.

1    14.  ATL first notified the Defendant CosMX of its

2  allegation regarding infringement of the '987 Patent on June

3  the 28th, 2021.

4    15.  The accused products are lithium-ion battery

5  products made by Defendant CosMX.

6    16.  ATL and CosMX engaged in meetings on June the 30th,

7  2021; July the 14th, 2021; July the 28th, 2021; August the

8  12th, 2021; September the 3rd, 2021; and September the 10th,

9  2021, to discuss CosMX's alleged infringement of ATL's patents

10 and potential resolution of the alleged infringement.

11    Now, during the course of the trial certain testimony has

12 been presented to you through what are called depositions.  A

13 deposition is the sworn, recorded answers to questions asked

14 to a witness in advance of the trial.  If a witness cannot be

15 present to testify in person, or if allowed by other limited

16 circumstances under the Rules, then the witness' testimony may

17 be presented under oath in the form of a deposition.

18    Before the trial began, the attorneys representing the

19 parties in this case questioned these deposition witnesses

20 under oath.  At that time, a court reporter was present and

21 recorded their sworn testimony.

22    Deposition testimony, ladies and gentlemen, is entitled

23 to the same consideration by you as testimony given by a

24 witness in person who testifies in open court from the witness

25 stand.  Accordingly, you should judge the credibility and the

1    importance of deposition testimony to the best of your

2    ability, just as if the witness had testified in open court

3    before you in person.

4         Now, while you should consider only the evidence in this

5    case, you are permitted to draw such reasonable inferences

6    from the testimony and exhibits as you feel are justified in

7    the light of common experience.  Said another way, you may

8    make deductions and reach conclusions that reason and common

9    sense lead you to draw from the facts that have been

10   established by the testimony and the evidence in this case.

11        However, you should not base your decision on any

12   evidence not presented by the parties during this trial,

13   including your own personal experience with any of the

14   products that are at issue in this case.

15        Now, unless I instruct you otherwise, you may properly

16   determine that the testimony of a single witness is sufficient

17   to prove any fact, even if a greater number of witnesses may

18   have testified to the contrary, if after considering all the

19   evidence, you believe that single witness.

20        When knowledge of a technical subject may be helpful to

21   the jury, a person who has special training and experience in

22   that technical field--we call them an expert witness--is

23   permitted to state his or her opinions on those technical

24   matters to the jury.  However, ladies and gentlemen, you are

25   not required to accept those opinions.  As with any other

1    witness, it is solely up to you to decide whether or not to

2    rely on the testimony of expert witnesses and all the other

3    witnesses.

4        Now, certain exhibits have been shown to you over the

5    course of the trial that were simply illustrations.  We call

6    these types of exhibits demonstrative exhibits.  You may have

7    heard them simply referred to as a demonstrative.

8    Demonstrative exhibits are a party's depiction, picture, or

9    model to describe something involved in the trial.  If your

10   recollection of the evidence differs from these

11   demonstratives, you should rely on your recollection.

12       Demonstrative exhibits are sometimes called jury aids,

13   and demonstrative exhibits themselves, ladies and gentlemen,

14   are not evidence, but a witness' testimony concerning a

15   demonstrative is evidence.  These demonstrative exhibits are

16   not going to be available to you to review or consider in the

17   jury room during your deliberations.

18       Now, in any legal action, facts must be proven by a

19   required amount of evidence known as the burden of proof.  The

20   burden of proof in this case is on the Plaintiff ATL for some

21   issues and is on the Defendant, CosMX, for other issues.

22   There are two burdens of proof that you will apply in this

23   case.  They are the preponderance of the evidence and clear

24   and convincing evidence.

25       The Plaintiff in this case, ATL, has the burden of

1  proving patent infringement by a preponderance of the

2  evidence.  ATL has the burden of proving willful patent

3  infringement by a preponderance of the evidence.  ATL has the

4  burden of proving damages for any patent infringement that you

5  may find by a preponderance of the evidence.  Likewise, the

6  Defendant CosMX has the burden of proving its antitrust

7  counterclaim and damages by a preponderance of the evidence.

8       I'm sorry.  Let me restate that.

9       The Defendant CosMX, which you've heard throughout the

10  trial referred to as the Defendant or simply as CosMX, has the

11  burden of proving its antitrust claims by clear and convincing

12  evidence and damage for any antitrust claim violations by a

13  preponderance of the evidence.

14      A preponderance of the evidence means evidence that

15  persuades you that a claim is more probably true than not

16  true.  Sometimes this is talked about as being the greater

17  weight and degree of credible testimony.

18      CosMX also has the burden of proving invalidity of ATL's

19  patent claims by clear and convincing evidence.  Further,

20  CosMX also bears the burden to prove by clear and convincing

21  evidence that ATL's threat of Chinese patent litigation was

22  objectively baseless and constituted an attempt to interfere

23  directly with the business relationships of one or more

24  competitors through the use of the litigation process.

25      Clear and convincing evidence, ladies and gentlemen,

1   means evidence that produces in your mind an abiding

2   conviction that the truth of the party's factual contentions

3   are highly probable.  Although proof to an absolute certainty

4   is not required, the clear and convincing evidence standard

5   requires a greater degree of persuasion than is necessary for

6   the preponderance of the evidence standard.  If proof

7   establishes in your mind an abiding conviction in the truth of

8   the matter, then the clear and convincing evidence standard

9   has been met.

10      Now, as I've previously told you, these two burdens of

11  proof are not to be confused with a third and different burden

12  of proof known as beyond a reasonable doubt, which is the

13  burden of proof applied in a criminal case and which has no

14  application whatsoever in a civil case like this.  Beyond a

15  reasonable doubt is a higher standard than both the

16  preponderance of the evidence and clear and convincing

17  evidence.

18      Now, as I did at the beginning of the case, I'm going to

19  first give you a summary of each side's contentions and then

20  provide you with detailed instructions on what each side must

21  prove in order to win on each of its contentions.

22      As I previously told you, there are two components in

23  this case.

24      The first component is an action for patent infringement.

25  Plaintiff ATL contends that Defendant CosMX infringes certain

claims of the patents-in-suit.  Remember, there are three

United States patents at issue in this case.  They are United

States Patent No. 11,329,352, which you've heard referred to

throughout the trial as the '352 Patent; U.S. Patent No.

10,833,363, which you've heard referred to as the '363 Patent;

and U.S. Patent No. 10,964,987, which you've heard referred to

as the '987 Patent.

The Plaintiff ATL contends that the Defendant CosMX

infringes the following claims of these three patents-in-suit:

claim 1 of the '352 Patent, claim 1 of the '363 Patent, and

claims 1 and 17 of the '987 Patent.  These are the asserted

claims.

Atl contends that CosMX has infringed these asserted

claims by making, using, selling, or offering for sale in the

United States, or importing into the United States its

lithium-ion battery products.  And I'll refer to these as the

accused products.

Atl further alleges that CosMX's infringement of the

asserted patents has been and was willful.

Atl contends that it's entitled to money damages in the

form of a reasonable royalty for CosMX's infringement.  ATL

has the burden to prove these issues by a preponderance of the

evidence.

Defendant CosMX denies that it infringes any of the

asserted claims of the three patents-in-suit.  CosMX denies

that it makes, uses, offers for sale, sells into the United
States, or imports into the United States any accused product
that infringes any of the asserted claims.

Cosmx also denies that any alleged infringement has been
and was willful.

Cosmx also denies that it owes ATL any money damages.

CosMX contends that claim 1 of the '363 Patent and claims
1 and 17 of the '987 Patent are invalid as being anticipated
by the prior art.  CosMX also contends that claim 1 of the
'352 Patent is invalid as being rendered obvious by the prior
art.

Atl denies that any of ATL's asserted claims are invalid.
CosMX has the burden to prove invalidity by clear and
convincing evidence.

Invalidity and infringement, ladies and gentlemen, are
separate and distinct issues, and your job is to decide
whether CosMX has infringed the asserted claims and whether
those claims are invalid.  If you decide that any asserted
claim has been infringed and is not invalid, you will then
need to decide the amount of money damages, if any, to be
awarded to ATL to compensate it for the infringement.

If you decide that there has been any infringement and it
was willful, that decision about willfulness should not affect
any damages award that you might make.  The Court will take
willfulness into account later if you find it.

1    Now, this is the first component in this case.

2    There is a second component in this case where the

3 Defendant CosMX asserts several affirmative claims against

4 ATL, and I told you at the beginning of the case, these are

5 called counterclaims.

6    CosMX contends that ATL threatened CosMX with litigation

7 involving certain Chinese patents.  These threats, according

8 to CosMX, were not made out of a genuine concern for

9 legitimate patents, but instead were meant to damage CosMX and

10 impede CosMX's ability to compete.

11    In particular, CosMX contends the threats were timed to

12 interfere with and delay CosMX's planned initial public

13 offering of its shares on the Shanghai Stock Exchange, what

14 you heard to throughout the trial as CosMX's IPO.  CosMX

15 alleges the threats were effective in achieving their intended

16 purpose and that CosMX's IPO was delayed by approximately two

17 months due to the actions of ATL.

18    Cosmx claims that that delay resulted in CosMX raising

19 significantly less money than it otherwise would have raised

20 had the IPO not been delayed, and that that caused CosMX to

21 incur significant additional expenses to get the IPO approved.

22    CosMX further alleges that ATL used patent litigation

23 threats as a means of attempting to coerce CosMX into agreeing

24 with ATL for a no-poach agreement by which CosMX and ATL would

25 agree that CosMX would not hire highly-skilled,

1    technologically-specialized ATL employees.

2        CosMX contends that ATL's actions violated federal

3    antitrust law, sometimes referred to in this case as Section 2

4    of the Sherman Act.  Specifically, ATL contends that ATL's

5    actions -- CosMX contends that ATL's actions constituted an

6    attempted monopolization of the relevant market for

7    lithium-ion batteries used in smartphones and the relevant

8    market for a lithium-ion batteries used in laptops in

9    violation of Section 2 of the Sherman Act.

10       ATL denies that it has violated Section 2 of the Sherman

11   Act.  ATL contends that it did not offer a no-poach agreement,

12   but instead complained that CosMX was hiring engineering

13   personnel away from ATL specifically to gain access to ATL's

14   confidential information and trade secrets, and that this

15   related to its reasonable belief that CosMX was infringing its

16   U.S. and Chinese patents.  ATL further contends that none of

17   its actions actually did or even could have hurt CosMX's

18   competitive position.

19       Now, if you decide that ATL has violated Section 2 of the

20   Sherman, you'll then need to decide on the amount of money

21   damages, if any, that should be awarded to CosMX as

22   compensation for that alleged violation.

23       And this is the second component in this case.

24       Now, before you can decide many of these issues, you'll

25   need to understand the role of the patent claims.  The patent

1  claims, ladies and gentlemen, are those numbered sentences at

2  the end of each patent.

3       The claims are important because it's the words of the

4  claims that define what a patent covers.  The figures and the

5  text in the rest of the patent provide a description and/or

6  examples of the invention and they provide a context for the

7  claims, but it is the claims themselves that define the

8  breadth of the patent's coverage.

9       Each claim is effectively treated as if it were a

10  separate patent, and each claim may cover more or less than

11  any other claim.  Therefore, what a patent covers depends, in

12  turn, on what each of its claims covers.

13       You will first need to understand what each claim covers

14  in order to decide whether or not there is infringement of the

15  claim and to decide whether or not the claim is invalid.  Now,

16  the law says that it's my job to define the terms of the

17  claims and it's your job to apply my definitions to the issues

18  that you are asked to decide in this case.

19       As a result and as I've explained to you at the beginning

20  of the case, I've already determined the meaning of certain

21  claim language and I have provided those definitions or

22  constructions to you in your juror notebooks.  You must accept

23  and apply my definitions to this language -- to this claim

24  language as being correct.  It's your job to take these

25  definitions or constructions, they're sometimes called, and

1  apply them to the issues that you are deciding, including the

2  issues of infringement and invalidity.

3      Now, for any claim language which I have not provided you

4  with a definition or construction, you should apply the plain

5  and ordinary meaning of that language.

6      You should also disregard any evidence presented to you

7  at trial that contradicts or is inconsistent with these

8  constructions or definitions that I have given you.  For claim

9  limitations or language -- for claim limitations or claim

10  language that I have not construed--that is, limitations or

11  language I have not interpreted or defined for you--you are to

12  use, as I've told you, the plain and ordinary meaning of that

13  language as understood by one of ordinary skill in the art,

14  which is to say, in the field of the technology of the patent,

15  at the time of the claimed invention or the alleged invention.

16      The meaning of the words in the patent claims must be the

17  same when deciding both infringement and invalidity.  And

18  you've been provided with copies of each of the three asserted

19  patents inside your juror notebooks, and you may refer to them

20  and consider them during your deliberations.

21      Now, several times in these instructions I will refer and

22  have referred to a person of ordinary skill in the field of

23  the invention, or a person of ordinary skill in the art.  In

24  deciding the level of ordinary skill in the field, you should

25  consider all the evidence introduced at trial, including but

1    not limited to:  the levels of education and experience of the

2    inventor or other persons actively working in the field; the

3    types of problems encountered in the field; the previous

4    solutions to those problems; and the rapidity with which

5    innovations are made; and the sophistication of the

6    technology.

7         Now, the claims, ladies and gentlemen, are intended to

8    define in words the boundaries of the inventor's rights.  Only

9    the claims of the patent can be infringed.  Neither the

10   written description, the specification, the drawings, the

11   figures, anything else, can be infringed.  Only the claims can

12   be infringed, and each of the claims must be considered

13   individually.

14        I'll now explain to you how a claim defines what it

15   covers.

16        A claim sets forth in words a set of requirements.  Each

17   claim sets forth its requirements in a single sentence.  If a

18   product satisfies each of these requirements, then it is

19   covered by the claim.  And there can be several claims in a

20   patent, and each claim may be narrower or broader than any

21   other claim by setting forth more or fewer requirements.

22        The coverage of a patent is assessed on a claim-by-claim

23   basis.  And in patent law, the requirements of a claim are

24   often referred to as the claim elements or the claim

25   limitations.  Those are the same thing.  When a product meets

1     all the requirements of a claim, all the claim limitations,

2     all the claim elements, the claim is said to cover that

3     product, and that product is said to fall within the scope of

4     that claim.

5         In other words, ladies and gentlemen, a claim covers a

6     product where each of the claim elements or limitations is

7     present in that product.  If a product is missing even one

8     limitation or element of a claim, the product is not covered

9     by the claim.  And if the product is not covered by the claim,

10    the product cannot infringe the claim.

11        Now, the beginning portion or preamble of a claim often

12    uses the word 'comprising'.  The word 'comprising' when used

13    in the preamble of a claim means including but not limited to

14    or containing but not limited to.  When comprising is used in

15    a preamble, if you decide that an accused product includes all

16    of the requirements of that claim, the claim is infringed, and

17    this is true even if the accused product contains additional

18    or extra elements.

19        For example, a claim to a table comprising a tabletop,

20    legs, and glue would be infringed by any table that includes a

21    tabletop, legs, and glue, even if the table also contains

22    other structures such as leaves that would expand the size of

23    the tabletop or wheels that would go on the ends of the legs.

24        Now, this case involves two types of patent claims:

25    independent claims and dependent claims.  Claim 1 of the '352

1  Patent, claim 1 of the '363 Patent, and claim 1 of the '987

2  Patent are independent patent claims.  Claim 17 of the '987

3  Patent is a dependent patent claim.

4      An independent claim, ladies and gentlemen, sets forth

5  all the requirements that must be met in order to be covered

6  by that claim.  It is not necessary to look at any other claim

7  to determine what an independent claim covers.

8      On the other hand, a dependent claim does not itself

9  recite all the requirements of a claim, but refers to another

10  claim for some of its requirements.  In this way, the

11  dependent claim depends on another claim.  A dependent claim

12  incorporates all the requirements of the claim to which it

13  refers, or as we sometimes say, from which it depends, and

14  then the dependent claim adds its own additional requirements.

15      So to determine what an dependent claim covers, it's

16  necessary to look at both the dependent claim itself and any

17  other claim to which it refers or from which it depends.  A

18  product that meets all the requirements of both a dependent

19  claim and the claim to which that dependent claim is covered

20  by that dependent claim.

21      If a person or a corporation makes, uses, sells, or

22  offers to sell within the United States, or imports into the

23  United States what is covered by a patent claim without the

24  patent owner's permission, that person or corporation is said

25  to infringe the patent.

1    In reaching your decision on infringement, keep in mind,

2    ladies and gentlemen, that only the claims of a patent can be

3    infringed, and you must compare the asserted patent claims as

4    I have construed them for you, to the accused products to

5    determine whether or not there is or is not infringement.  And

6    this is the only correct comparison--comparing the patent

7    claims to the accused products.

8    You should not compare the accused products with any

9    specific examples set out in the patent, with the prior art,

10   or with ATL's own products in reaching your decision on

11   infringement.  You should also not compare ATL's patents to

12   CosMX's patents or patent applications when deciding whether

13   or not CosMX's products infringe ATL's patents.

14   In deciding infringement, the only correct comparison is

15   between the accused products and the limitations of the claims

16   as the Court has construed them.  You must reach your decision

17   as to each assertion of infringement based on my instructions

18   about the meaning and scope of the claims, the legal

19   requirements for infringement, and the evidence presented to

20   you by the competing parties.

21   I'll now instruct you on the specific rules that you must

22   follow to determine whether ATL has proven that CosMX has

23   directly infringed one or more of the patent claims involved

24   in this case.

25   A patent can be directly infringed even if the alleged

1  direct infringer did not have knowledge of the patent and

2  without the direct infringer knowing that what it did was

3  infringement of the claim.  A patent can also be directly

4  infringed even though the accused direct infringer believed in

5  good faith that what it did was not infringement of the

6  patent.  Infringement does not require proof that any party

7  copied its product from the asserted claims.

8      You must determine separately for each asserted claim

9  whether or not there is infringement.  However, if you find

10 that an independent claim on which other claims depend is not

11 infringed, there cannot be infringement of any dependent claim

12 that refers directly or indirectly to that independent claim.

13     On the other hand, if you find that an independent claim

14 has been infringed, you must still decide, separately, whether

15 the product meets the additional requirements of any claims

16 that depend from that independent claim; that is, whether

17 those claims also have been infringed.  A dependent claim,

18 again, includes all the requirements of any of the claims to

19 which it refers plus the additional requirements set forth

20 within the dependent claim itself.

21     Now, in order to prove direct infringement of a patent

22 claim, ATL must show by a preponderance of the evidence that

23 the accused products include each and every limitation or

24 element of the claim.

25     In determining whether the accused products directly

1   infringe a patent claim in this case, you must compare the

2   accused products with each and every one of the requirements

3   or limitations of that claim to determine whether the accused

4   product contains each and every requirement or limitation

5   recited in the claim.  An accused product infringes a claim if

6   it is reasonably capable of satisfying the claim elements,

7   even though it may also be capable of non-infringing modes of

8   operation.

9        A claim requirement is literally present if it exists in

10  an accused product just as it is described in the claim

11  language, either as I have explained or construed that

12  language for you, or if I did not construe it, as it would be

13  understood by its plain and ordinary meaning by a person of

14  ordinary skill in the art.  If an accused product omits any

15  element recited in a claim, then you must find that the

16  product in question does not literally infringe that claim.

17       So long as an accused product has each and every one of

18  the claim requirements, infringement of that claim is shown,

19  even if the product contains additional features or elements

20  that are not required by the claims.

21       I'll now instruct you on the issue of indirect

22  infringement.

23       In this case, ATL has accused CosMX of indirect

24  infringement by actively inducing its customers to directly

25  infringe the asserted claims of the asserted patents.  As with

direct infringement, you must determine whether there has been

active inducement on a claim-by-claim basis.

Cosmx is liable for induced infringement of a claim only

if ATL proves by a preponderance of the evidence that:

1.  Acts have been carried out by CosMX customers that

directly infringe that claim;

2.  CosMX has taken action during the time the asserted

patent was in force, intending to cause the infringing acts by

its customers; and

3.  CosMX has been aware of the asserted patents and has

known that the acts of its customers constitute infringement

of the asserted patents, or was willfully blind to that

infringement.

Willful blindness, ladies and gentlemen, is established

if CosMX believed there was a high probability that the acts,

if taken, would constitute infringement of the asserted

claims, but deliberately avoided confirming that belief.

To establish induced infringement, it is not sufficient

that someone else directly infringes a claim, nor is it

sufficient that a company accused of inducing another's direct

infringement merely had notice or knowledge of an asserted

patent or had been aware of the acts by another that allegedly

constitute direct infringement.

And the mere fact that the company accused of inducing

another's direct infringement had known or should have known

1  that there was a substantial risk that someone else's acts

2  would infringe is not sufficient.  Rather, in order to find

3  inducement, you must find that CosMX specifically intended or

4  was willfully blind to that infringement.

5       ATL also contends that CosMX has willfully infringed the

6  patents-in-suit.  If you decide that CosMX has infringed any

7  of the asserted claims, you must go on and address the issue

8  of whether or not that infringement was willful.  ATL has the

9  burden of proving willful infringement by a preponderance of

10  the evidence.

11       You may not determine that infringement was willful just

12  because CosMX knew of the asserted patents and infringed them.

13  You may find that CosMX willfully infringed if you find that

14  CosMX deliberately or intentionally infringed the asserted

15  patents.

16       You may find that CosMX's actions were willful if CosMX

17  acted in reckless or callous disregard of, or with

18  indifference to, the rights of ATL.  A defendant is

19  indifferent to the rights of another when it proceeds in

20  disregard of a high or excessive danger of infringement that

21  is known to it or was apparent to a reasonable person in its

22  position.

23       To determine whether CosMX acted willfully, consider all

24  the facts and assess CosMX's knowledge at the time of the

25  challenged conduct.  Facts that may be considered include:

1.   Whether or not CosMX acted consistently with the standards of behavior for its industry;

2.   Whether or not CosMX intentionally copied a product of ATL that is covered by the asserted patents;

3.   Whether or not CosMX reasonably believed that it did not infringe or that the asserted claims of the patents were invalid;

4.   Whether or not CosMX made a good-faith effort to avoid infringing the asserted patents, for example, whether CosMX attempted to design around the asserted patents; and

5.   Whether or not CosMX tried to cover up its infringement.

You may find that CosMX's actions were deliberate or intentional if CosMX was willfully blind to ATL's patent rights.

Your determination, ladies and gentlemen, of willfulness should incorporate the totality of the circumstances based on the evidence presented during this trial.  Willfulness can be established by circumstantial evidence.  And if you decide that any infringement you have found was willful, that decision should not affect any damages that you might award. The Court, as I told you, will take willfulness into account later, if you find it.

I'll now instruct you on the rules that you must apply in deciding whether or not CosMX has proven that any asserted

1  claims of the asserted patents are invalid.

2  An issued United States patent is accorded a presumption

3  of validity based on the presumption that the United States

4  Patent and Trademark Office, which you've heard referred to

5  during the trial as the PTO, or the Patent Office, acted

6  correctly in issuing the patent.  This presumption of validity

7  extends to all issued United States patents.

8  In order to overcome this presumption, CosMX must

9  establish by clear and convincing evidence that a claim is

10  invalid.  Like infringement, ladies and gentlemen, invalidity

11  is determined on a claim-by-claim basis.  And you must

12  determine separately for each claim whether that claim is

13  invalid.  If one claim of a patent is invalid, this does not

14  necessarily mean that any other claim is invalid.

15  Now, claims are construed in the same way for determining

16  infringement as for determining invalidity, and you must apply

17  the claim language consistently and in the same manner for

18  issues of infringement as for the issues of invalidity.  And

19  in making your determination as to invalidity, you must

20  consider each claim separately.

21  A previous device, system, method, publication, or patent

22  that predates the claimed invention is generally called prior

23  art, and may include items that disclose the claimed invention

24  or elements of the claimed invention and were in public use,

25  on sale, or otherwise available to the public.  Prior art may

1  be authored or created by anyone.  In evaluating the prior art

2  to determine whether an invalidity defense has been proven by

3  clear and convincing evidence, you may consider whether that

4  prior art was or was not before the PTO.

5        The Defendant, CosMX, contends that the asserted claims

6  of the '987 and the '363 Patents are invalid because the

7  inventions defined in those claims were on sale before the

8  effective filing dates of the '987 and '363 Patents.

9        A claim is invalid if, before the effective filing date,

10  an embodiment of the claimed invention was both (1) the

11  subject of a commercial sale or offer for sale, and (2) ready

12  for patenting.  CosMX must show both requirements by clear and

13  convincing evidence.

14        A commercial offer for sale was made if another party

15  could make a binding contract by accepting the offer.  An

16  invention was subject to an offer for sale if the claimed

17  invention was embodied in an actual product and that product

18  was commercially sold or offered for sale, even if it was done

19  confidentially.  It is not required that a sale was actually

20  made.

21        The invention must also have been ready for patenting at

22  the time of the sale or offer for sale.  The claimed invention

23  is ready for patenting when there is reason to believe that it

24  would work for its intended purpose.

25        An invention is ready for patenting either when it is

1    reduced to practice or when the inventor has prepared drawings

2    or other descriptions of the invention that were sufficiently

3    specific to enable a person of ordinary skill in the art to

4    practice the invention.  An invention was reduced to practice

5    when it has been constructed within the scope of the patent

6    claims and determined that it works for its intended purpose.

7         Now, the Defendant CosMX also contends that the asserted

8    claims are invalid because the invention defined in those

9    claims were described in printed publications before the

10   effective filing dates.  A patent claim is invalid if a

11   publication printed before the effective filing date was

12   maintained in some tangible form, such as printed pages,

13   electronic files, microfilm, photographs, internet

14   publications, or photocopies, and was sufficiently accessible

15   to persons interested in the subject matter of its contents.

16        Information is publicly accessible if it was distributed

17   or otherwise made available such that persons interested and

18   ordinarily skilled in the subject matter exercising reasonable

19   diligence could locate it.  It's not necessary that the

20   printed publication to have -- it's not necessary for the

21   printed publication to have been available to every member of

22   the public.

23        The disclosure of the claimed invention in the printed

24   publication must be complete enough to enable one of ordinary

25   skill in the art to use the invention without undue

1    experimentation.  In determining whether the disclosure is

2    enabling, you should consider what would have been within the

3    knowledge of a person of ordinary skill in the art as of the

4    effective filing date, and you may consider evidence that

5    sheds light on the knowledge that such a person would have

6    had.

7         I'll now instruct you on how to determine whether any of

8    the asserted claims of the asserted patents are invalid as

9    anticipated.

10        In order for someone to be entitled to a patent, the

11   invention must actually be new, and the inventor must not have

12   lost his or her rights by delaying the filing of an

13   application claiming the invention.  In general, ladies and

14   gentlemen, inventions are new when the identical method has

15   not been used or disclosed before.

16        CosMX contends that the asserted claims of the '363 and

17   the '987 Patents are invalid because the claimed inventions

18   are not new.  In other words, CosMX contends that the patents

19   are anticipated by the prior art.

20        Anticipation requires that all the requirements of a

21   patent claim be disclosed in a single prior art reference.

22   Also, the single prior art reference must disclose all

23   elements of the claim arranged or combined as the same way as

24   in the claim as the claim has been construed or interpreted by

25   the Court.

1    Cosmx must prove by clear and convincing evidence that an

2    asserted patent claim was anticipated by the prior art

3    reference.  Anticipation must be determined on a

4    claim-by-claim basis.

5    To anticipate the invention, the prior art does not have

6    to use the same words as in the claim, but all the

7    requirements of the claim must have been disclosed, either

8    stated expressly or implied, to a person having ordinary skill

9    in the art in the technology of the invention, so that looking

10   at that one reference, that person could make and use the

11   claimed invention without undue experimentation.

12   Keep in mind that CosMX may not establish anticipation by

13   arguing that the accused products practice the prior art, or

14   by comparing the accused products to a prior art reference.

15   An item of prior art may anticipate without explicitly

16   disclosing a feature of the claimed invention if that missing

17   characteristic was necessarily present, or inherent, in the

18   single anticipating reference.

19   In this case, CosMX also contends that claim 1 of the

20   '352 Patent is invalid as being obvious.

21   Even though an invention may not have been identically

22   disclosed or identically described in a single prior art

23   reference before it was made by an inventor, in order to be

24   patentable, the invention must not have been obvious to a

25   person of ordinary skill in the field of the technology of the

1  patent at the time the invention was made.

2  CosMX has the burden of establishing obviousness by

3  showing by clear and convincing evidence that the claimed

4  invention would have been obvious to persons having ordinary

5  skill in the art at the time the invention was made.

6  In determining whether a claimed invention is obvious,

7  you must consider the level of ordinary skill in the field

8  that someone would have had at the time the invention was

9  made, the scope and content of the prior art, and any

10 differences between the prior art and the claimed invention.

11 Keep in mind, ladies and gentlemen, that the existence of

12 each and every element of the claimed invention in the prior

13 art does not necessarily prove obviousness.  Most, if not all,

14 inventions rely on the building blocks of prior art.  The

15 skill of the actual inventor is not necessarily relevant

16 because inventors may possess something that distinguishes

17 them from persons having ordinary skill in the art.

18 Now, in considering whether the claimed invention was

19 obvious, you must first determine the scope and content of the

20 prior art.  The scope and content of the prior art includes at

21 least prior art as in the same field as the claimed invention.

22 It also includes prior art from different fields that a person

23 of ordinary skill in the art would have considered when trying

24 to solve the problem that is addressed by the invention.

25 Further, teachings, suggestions, and motivations may also

be found within the knowledge of a person with ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together like the pieces of a puzzle.  The person of ordinary skill in the art would have the capability and understanding of the scientific and engineering principles applicable to the prior art.

In considering whether a claimed invention is obvious, you may but are not required to find obviousness if you find at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field to combine the known elements in a way the claimed invention does, taking into account such factors as:

1.  Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.  Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.  Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.  Whether the prior art teaches away from combining elements in the claimed invention;

5.  Whether it would have been obvious to try the combination of elements in the claimed invention, such as when

1    there is a design need or market pressure to solve a problem

2    and there are a finite number of identified, predictable

3    solutions; and

4        6.   Whether the change resulted more from design

5    incentives or other market forces.

6        To find the invention as obvious, you must find that the

7    prior art provided a person having ordinary skill in the field

8    a reasonable expectation of success.  That something may have

9    been obvious to try is not sufficient in fields related to

10   unpredictable technologies.

11       Now, the determining whether the claimed invention was

12   obvious, consider each claim separately.  Do not use

13   hindsight; consider only what was known at the time of the

14   invention.  In other words, you should not consider what a

15   person of ordinary skill in the art would know today or what

16   has been learned from the teachings of the '352 Patent.

17       In making these assessments, you should take into account

18   any objective evidence, sometimes called secondary

19   considerations, that may have existed at the time of the

20   invention, and afterwards, and may shed light on the

21   obviousness or not of the claimed invention.

22       Now, the following are possible secondary considerations,

23   but it's up to you, ladies and gentlemen, to determine whether

24   secondary considerations of non-obviousness exist at all.

25   These are:

1. Whether the invention was commercially successful as the result of the merits of the claimed invention rather than the result of design needs or market pressure, advertising, or similar activities;

2. Whether the invention satisfied a long-felt need;

3. Whether the inventor proceeded contrary to accepted wisdom in the field;

4. Whether others tried, but failed, to solve the problem solved by the claimed invention;

5. Whether others invented the invention at roughly the same time;

6. Whether others copied the claimed invention;

7. Whether others accepted licenses under the patents-in-suit because of the merits of the claimed invention;

8. Whether the claimed invention achieved unexpected results;

9. Whether others in the field praised the claimed invention;

10. Whether there were changes or related technologies or market needs contemporaneous with the invention; and

11. Whether persons having ordinary skill in the art at the time of the invention expressed surprise or disbelief regarding the invention.

These factors are relevant only if there is a connection

1  or a nexus between the factors and what differentiates the

2  claimed invention from the prior art.  ATL has the burden of

3  establishing this connection or nexus.

4      Moreover, even if you conclude that some of the above

5  indicators of objective evidence have been satisfied, those

6  factors should be considered along with all the other evidence

7  in the case in determining whether CosMX has proven that the

8  claimed invention would have been obvious.

9      In support of obviousness, you may also consider whether

10 others independently invented the claimed invention before or

11 at about the same time as the named inventor thought of it.

12 In making these determinations a person of ordinary skill uses

13 simple common sense and can rely upon the inferences and

14 creative steps that a person of ordinary skill in the art

15 would employ.

16     Also, CosMX does not need to show that one of ordinary

17 skill would actually have combined the physical structures of

18 two references.  One need only combine the teachings.

19     Remember, and as stated earlier, that prior art is not

20 limited to patents and published materials, but includes the

21 general knowledge that would have been available at the time

22 to one of ordinary skill in the field of the invention.  If

23 you find that CosMX has proven the obviousness of a claim by

24 clear and convincing evidence, then you must find that that

25 claim is invalid.

1    Now, at this point, ladies and gentlemen, we're going too

2    take a short break.  I'm going to allow you to retire to the

3    jury room, and in about five minutes I'll have you back and

4    continue with these final jury instructions.

5        The jury's excused to the jury room.

6              (Whereupon, the jury left the courtroom.)

7              THE COURT:  Be seated, please.

8              MR. ANDERSON:  Your Honor, can I raise an issue in

9    the instructions?

10             THE COURT:  In the middle of my instructions, Mr.

11   Anderson?

12             MR. ANDERSON:  Yes, Your Honor.

13             THE COURT:  You believe this is timely?  We had an

14   informal charge conference and a formal charge conference.

15             MR. ANDERSON:  I think what the Court said on the

16   burden of proof differs from what we talked about this morning

17   on the antitrust counterclaim.

18       The Court said that on the substantive antitrust claim

19   the burden was also clear and convincing in addition to the

20   *Noerr* issue.  So the Court has put a second clear and

21   convincing evidence, and that was not anything the parties

22   ever discussed.  The parties were always in agreement that the

23   antitrust -- the merits of the antitrust claim, the elements

24   of that is a preponderance standard.  It's the threshold

25   question, *Noerr* question, that has the clear and convincing

1    evidence.

2         So if you look at the verdict form, there's Question 5

3    which is the *Noerr* question, which is a clear and convincing

4    evidence based on the Court's rulings.  But what the Court

5    told the jury this morning was that essentially when they

6    answer Question 6, that's also clear and convincing, and that

7    has never been the position of any of the parties.

8              THE COURT:  Do you have a response to that, Mr.

9    Wolfson?

10             MR. WOLFSON:  I believe they're right, Your Honor.

11   But the rest of the instructions that you are going to read I

12   believe are clear when you get to the substance of the

13   antitrust claims, that it is by preponderance of the evidence.

14   But it was the statement that you changed on the fly to clear

15   and convincing evidence believing, I suspect, that it was a

16   mistake in the writing.

17        We do agree that the substance of the antitrust claims

18   are preponderance but that you will instruct them as to that

19   and also that the verdict form says preponderance for the

20   substantive elements if they can get past the *Noerr-Pennington*

21   defense.

22             THE COURT:  All right.  Take your copy of the final

23   jury instructions and refer me to the page and line where you

24   believe that was a mistake -- a misstatement.

25             MR. ANDERSON:  It is page 6, Your Honor.  The

1 paragraph that begins, Likewise the Defendant has the burden

2 of proving its antitrust claim and damages by a preponderance

3 of the evidence, was what we had this morning.  In the

4 transcript it shows the Court said, Let me restate that.  The

5 Defendant CosMX, which you've heard throughout the trial

6 referred to as the defendant or simply as CosMX, has the

7 burden of proving its antitrust claims by clear and convincing

8 evidence.

9           THE COURT:  All right.  I will correct that on the

10 record with the jury when they return before I proceed with

11 the balance of my instructions.

12           MR. ANDERSON:  Thank you, Your Honor.

13                   (Pause in proceedings.)

14           THE COURT:  Mr. Richardson, will you check on the

15 jury, and if they're ready to come back in, bring in the jury,

16 please.

17           THE COURT SECURITY OFFICER:  A couple of minutes,

18 sir.

19           THE COURT:  Just let me know when they're ready.

20           THE COURT SECURITY OFFICER:  Yes, sir.

21           THE COURT:  Let's go off the record.

22                   (Off the record.)

23           THE COURT:  Let's go back on the record.

24           THE COURT SECURITY OFFICER:  We're ready, Your

25 Honor.

1    THE COURT:  Bring them in.

2        (Whereupon, the jury entered the courtroom.)

3    THE COURT:  Please be seated.

4    Before I proceed with the remainder of my instructions,

5  ladies and gentlemen, I need to correct one unintentional

6  misstatement.

7    I told you earlier that the Defendant CosMX has the

8  burden of proving its antitrust claim and damages by clear and

9  convincing evidence.  That was a misstatement.  CosMX, the

10  Defendant, has the burden of proving its antitrust claim and

11  damages by a preponderance of the evidence.  I'd like to

12  correct that in your minds.

13    Now I'll continue with the remainder of my instructions

14  where we stopped briefly for a break.

15    If you find that CosMX has infringed any valid claim of

16  the asserted patents, you must then consider what amount of

17  damages, if any, to award to ATL, the Plaintiff.

18    I'll now instruct you about the measure of damages, but

19  by instructing you on damages, I am not suggesting which party

20  should win this case on any issue.  If you find that CosMX has

21  not infringed any valid claim of the patents-in-suit, then ATL

22  is not entitled to any patent damages.

23    ATL has the burden to establish the amount of its damages

24  by a preponderance of the evidence.  In other words, you

25  should award only those damages that ATL establishes that it

more likely than not suffered as a result of CosMX's

infringement.  While ATL is not required to prove the amount

of its damages with mathematical precision, it must prove them

with reasonable certainty.  And ATL is not entitled to damages

that are remote or that are only speculative.

The damages that you might award, if any, are meant to

compensate ATL for any infringement that you may find.  You

must not award ATL more damages than are adequate to

compensate it for the infringement.  You also must not award

any additional amount for the purpose of punishing CosMX or

setting an example.

I'll now instruct you on how to calculate reasonable

royalty damages.

A royalty, ladies and gentlemen, is a payment made to a

patent holder in exchange for the right to make, use, or sell

the claimed invention.  A reasonable royalty is the amount of

royalty payment that a patent holder and the alleged infringer

would have agreed to in a hypothetical negotiation taking

place at a time prior to when the infringement first began.

In considering this hypothetical negotiation, you should

focus on what the expectations of the patent holder and the

alleged infringer would have been had they entered into an

agreement at that time, and had they acted reasonably in their

negotiations.  In determining this, you must assume that both

parties believed the patent was valid and infringed and that

1  both parties were willing to enter into an agreement.

2       The reasonable royalty that you determine must be a

3  royalty that would have resulted from the hypothetical

4  negotiation and not simply a royalty that either party would

5  have preferred.

6       Evidence of things that have happened after the

7  infringement first began can be considered in evaluating the

8  reasonable royalty only to the extent that the evidence aids

9  in assessing what royalty would have resulted from a

10  hypothetical negotiation.

11       Although evidence of the actual profits of an

12  alleged infringer -- that an alleged infringer made may be

13  used to determine the anticipated profits at the time of the

14  hypothetical negotiation, the royalty may not be limited or

15  increased based on the actual profits the alleged infringer

16  made.

17       The law requires that any royalty awarded to ATL

18  correspond to the value of the alleged inventions within the

19  accused products, as distinct from other unpatented features

20  of the accused products.  This is particularly true where the

21  accused products have multiple features and multiple

22  components not covered by the patent or where the accused

23  products work in conjunction with other non-patented items.

24       If unpatented features contribute to the accused

25  products, you must apportion that value to exclude any value

attributable to unpatented features.  You must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.

Some of the kinds of factors that you may consider in making your determination are:

1.  The royalties received by the patentee for licensing of the patents-in-suit, proving or tending to prove an established royalty;

2.  The rates paid by the licensee [sic] for the use of other patents comparable to the patents-in-suit.  Comparable license agreements include those covering the use of the claimed invention or similar technology;

3.  The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4.  The licensor's established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5.  The commercial relationship between the licensor and

licensee, such as whether they are competitors in the same
territory in the same line of business;

6.   The effect of selling the patented specialty in
promoting sales of other products of the licensee, the
existing value of the invention to the licensor as a generator
of sales of his non-patented items, and the extent of such
derivative or convoyed sales;

7.   The duration of the patent and the term of the
license;

8.   The established profitability of the product made
under the patents, its commercial success, and its current
popularity;

The utility and advantages -- this is 9.  The utility and
advantages of the patented property over the old modes or
device, if any, that had been used for working out similar
results;

10.   The nature of the patented invention, the character
of the commercial embodiment of it as owned and produced by
the licensor, and the benefits to those who have used the
invention;

11.   The extent to which the infringer has made use of
the invention and any evidence probative of the value of that
use;

12.   The portion of the profit or of the selling price
that may be customary in the particular business or in

1  comparable businesses to allow for the use of the invention or

2  analogous inventions;

3       13.  The portion of the realizable profits that should be

4  credited to the invention as distinguished from non-patented

5  elements, the manufacturing process, business risks, or

6  significant features or improvements added by the infringer;

7       14.  The opinion and testimony of qualified experts; and

8       15.  The amount that a licensor (such as the patentee)

9  and a licensee (such as the infringer) would have agreed upon

10 at the time the infringement began if both had been trying

11 reasonably and voluntarily to reach an agreement; that is, the

12 amount which a prudent licensee who desired, as a business

13 proposition, to obtain a license to the patented invention

14 would have been willing to pay as a royalty and yet be able to

15 make a reasonable profit and which amount would have been

16 acceptable to a prudent patentee who was willing to grant a

17 license.

18      You may have heard these factors referred to over the

19 course of the trial as the *Georgia-Pacific* factors.  No one of

20 these factors is dispositive, ladies and gentlemen, and you

21 can and you should consider the evidence that's been presented

22 to you in this case on each of these factors.  You may also

23 consider any other factors which, in your mind, would have

24 increased or decreased the royalty the alleged infringer would

25 have been willing to pay and the patent owner would have been

1    willing to accept, acting as normally prudent business people.

2        Now, the damages period for each asserted patent begins

3    on the date that CosMX received actual notice of the -- or

4    that the asserted patent -- actual notice of that asserted

5    patent, and the alleged infringement of that patent, and the

6    damages period ends with this trial.

7        If you award damages, the amount you award must reflect

8    damages for this infringement during this period only.  You

9    should not award any future damages.  For the '352 Patent, the

10   damage period begins on June the 21st, 2022, and ends today.

11   For the '363 Patent, the damages period begins on August the

12   2nd, 2022, and ends today.  For the '987 Patent, the damages

13   period begins on June the 28th, 2021, and ends today.  The

14   damages you award, if any, must be for conduct occurring

15   during these time periods.

16       Now, ladies and gentlemen, these are the instructions

17   related to the patent claims that relate to the first

18   component of this case as I've described it to you.

19       I'm now going to turn to the second component of this

20   case, which is CosMX's counterclaim that ATL has violated

21   federal antitrust laws.

22       The purpose of federal antitrust law is to preserve free

23   and unfettered competition in the marketplace.  The antitrust

24   laws rest on the central premise that competition produces the

25   best allocation of our economic resources, the lowest prices,

1   the highest quality, and the greatest material progress.

2       In this case, CosMX contends that ATL has violated the

3   federal antitrust laws by threatening to bring patent

4   infringement claims in China.  The only damages CosMX seeks in

5   connection with its counterclaims are those stemming from

6   ATL's threats to bring these Chinese patent assertions.

7       The United States Constitution ensures the right of

8   everybody, whether acting alone or in combination or agreement

9   with others, to petition or appeal to the courts for judicial

10  action, recognizing that when people do so, they will

11  naturally seek judicial action that favors them and also may

12  be unfavorable to others.

13      The law provides that the right to use the courts to seek

14  judicial action is an important right, and that the exercise

15  of that right, even by an agreement, does not normally violate

16  the antitrust laws.

17      Consistent with these general principles, a patent owner

18  is entitled to threaten or bring a patent infringement suit to

19  protect his or her patent rights, and the threat of bringing

20  such a suit ordinarily does not violate the Sherman Act, even

21  where the patent is later determined to be invalid,

22  unenforceable, or not infringed.

23      For a patent infringement suit to violate the Sherman

24  Act, CosMX must prove by clear and convincing evidence:

25      1.  ATL's threat of bringing Chinese patent infringement

1  suits was objectively baseless; and

2      2.  The baseless infringement assertions and suits were

3  an attempt to interfere directly with the business

4  relationships of one or more competitors through the use of

5  the litigation process as opposed to through the outcome of

6  the infringement suit.

7      A patent assertion is objectively baseless if no

8  reasonable litigant could expect success on the merits.  In

9  other words, if an objective litigant in ATL's position could

10  conclude that the suit is reasonably calculated to elicit a

11  favorable outcome, then the suit was not objectively baseless.

12      If you find that ATL's threat of patent litigation in

13  China was not objectively baseless, then you need not consider

14  whether the threat or subsequent lawsuit were an attempt to

15  harass or interfere with the business relationships of one or

16  more competitors.  Instead, you must find for ATL and against

17  CosMX on CosMX's charges that ATL violated the federal

18  antitrust laws by pursuing its Chinese patent assertions.

19      If, however, you find that ATL's threat of patent

20  litigation in China was objectively baseless, then you must

21  next determine whether ATL's primary objective was to hurt

22  competition by bringing or continuing these lawsuits

23  regardless of their ultimate outcome, or whether ATL's primary

24  objective was to obtain the relief it sought in these suits.

25      If you find that no reasonable person could have

1  realistically expected to succeed in a suit such as those ATL

2  threatened and brought against CosMX, and that ATL's primary

3  purpose in bringing or continuing to bring such suits was to

4  inflict harm on competition as opposed to the relief sought,

5  then you must next consider whether CosMX has proved the

6  remaining elements of its federal antitrust claim.

7       The U.S. antitrust law applies to import commerce of the

8  United States or to the conduct that affects interstate or

9  foreign commerce of the United States.  In this case, CosMX

10 contends that ATL is engaged in import commerce, and also that

11 ATL's conduct affects transactions in goods or services

12 between one or more persons in the United States and one or

13 more persons in a foreign nation.

14      CosMX must show either that (1) ATL's conduct involved

15 import commerce; or (2) that the challenged conduct had a

16 direct, substantial, and reasonably foreseeable effect on

17 commerce within the United States, or on imports into the

18 United States.  For each of these alternatives, CosMX must

19 prove that direct effects on either import or domestic U.S.

20 commerce give rise to its claims.

21      For CosMX to prove that ATL's conduct involved import

22 commerce, it is not necessary for ATL actually to have

23 imported products to the United States itself.  Instead, CosMX

24 must show only that ATL's anti-competitive behavior was

25 directed at an import market or that it was reasonably

1  foreseeable that ATL's anti-competitive behavior would impact

2  lithium-ion batteries sold in the United States.

3      The direct effects on commerce within the United

4  States -- excuse me.  For direct effects on commerce within

5  the United States, it is not necessary that the conduct

6  challenged occurs within the United States.  It is necessary,

7  however, that the effect of the challenged conduct be felt

8  directly by persons or firms within the United States.

9      It also is necessary that the effect within the United

10  States be more than indirect, remote, or unpredictable.  A

11  situation where action in a foreign country filters through

12  many layers and finally causes a few ripples in the United

13  States is not a direct effect for the purposes of this

14  analysis.

15      In determining whether the effect within the United

16  States of the challenged conduct was reasonably foreseeable,

17  you may consider a number of factors, including ATL's intent

18  and the likely or probable consequences of the challenged

19  conduct.  No one factor, however, is conclusive on this issue.

20      In its antitrust counterclaim, CosMX alleges ATL

21  unlawfully attempted to monopolize the market for lithium-ion

22  batteries used in smartphones and the market for lithium-ion

23  batteries used in laptops.  To prevail on its claim of

24  attempted monopolization, CosMX must prove each of the

25  following elements by a preponderance of the evidence:

1          1.  ATL engaged in the anti-competitive conduct;

2          2.  ATL had a specific intent to achieve monopoly power

3     in a relevant market;

4          3.  There was a dangerous probability that ATL would

5     achieve its goal of monopoly power in the relevant market;

6          4.  ATL's conduct occurred in or directly affected import

7     or U.S. domestic commerce; and

8          5.  CosMX was injured in its business or property by

9     ATL's anti-competitive conduct.

10         If you find that the evidence is insufficient to prove

11    any one or more of these elements, then you must find for ATL

12    and against CosMX on CosMX's claim of attempted

13    monopolization.  If you find that the evidence is sufficient

14    to prove all five of these elements, then you must find for

15    CosMX and against ATL on CosMX's claim of attempted

16    monopolization.

17         It's not sufficient for CosMX to prove that ATL intended

18    to monopolize the relevant market.  CosMX must also show that

19    ATL engaged in anti-competitive conduct, coupled with an

20    intent to monopolize and a dangerous probability that ATL

21    would succeed.  Generally, a firm engages in anti-competitive

22    conduct when it attempts to exclude rivals without an

23    efficiency-enhancing justification for its conduct.

24         Anti-competitive acts are acts, other than competition on

25    the merits, that, if successfully completed, would have the

1  effect of preventing or excluding competition or frustrating

2  the efforts of other companies to compete for customers within

3  the relevant market.

4      Harm to competition is to be distinguished from harm to a

5  single competitor, which does not necessarily constitute harm

6  to competition.  Some examples of harm to competition include

7  increased prices, decreased production levels, and reduced

8  quality.  Mere possession of monopoly power, if lawfully

9  acquired, does not violate the antitrust laws.  The

10  acquisition of monopoly power by supplying better products or

11  services, possessing superior business skills, or because of

12  luck, is not unlawful.

13      A competitor may compete aggressively without violating

14  the antitrust laws and may charge monopoly prices without

15  violating the antitrust laws.  Their conduct only becomes

16  unlawful where it involves anti-competitive acts.

17      The difference between anti-competitive conduct and

18  conduct that has a legitimate business purpose can be

19  difficult to determine.  This is because all companies have a

20  desire to increase their profits and increase their market

21  share.  These goals are an essential part of a competitive

22  marketplace, and the antitrust laws do not make these

23  goals--or the achievement of these goals--unlawful, as long as

24  a company does not use anti-competitive means to achieve these

25  goals.

1   In determining whether ATL's conduct was anti-competitive

2   and whether it was -- or whether it was legitimate business

3   conduct, you should determine whether the conduct is

4   consistent with the competition on the merits, whether the

5   conduct provides benefits to consumers, and whether the

6   conduct would make business sense apart from any effect it has

7   on excluding competition or harming competitors.

8        If you find that CosMX has proven by a preponderance of

9   the evidence that ATL's conduct was anti-competitive according

10  to these instructions, then you must consider whether CosMX

11  has proved the remaining elements of its antitrust

12  counterclaim.  If, however, you find that CosMX did not prove

13  this element by a preponderance of the evidence, then you must

14  find for ATL and against CosMX on this claim.

15       CosMX must prove by a preponderance of the evidence that

16  ATL attempted to monopolize a relevant market.  Defining the

17  relevant market is essential because you're required to make a

18  judgment about whether ATL has attempted to obtain monopoly

19  power in a properly defined economic market.  To make this

20  judgment, you must be able to determine what, if any, economic

21  forces restrain ATL's freedom to set prices for or to restrict

22  the production level of the products and/or the employees in

23  the relevant markets CosMX alleges.

24       The most likely and most important restraining force will

25  be actual and potential competition from other firms and their

1    products.  This includes all firms and products that act or

2    likely could act as restraints on ATL's power to set prices as

3    it pleases because customers could switch to them if ATL sets

4    its own prices too high.  All the firms and products that

5    exert such restraining force are within what is called the

6    relevant market.

7         There are two aspects you must consider in determining

8    whether CosMX has met its burden to prove the relevant market

9    by a preponderance of the evidence.  The first is the relevant

10   product market.  The second is the relevant geographic market.

11        The basic idea of a relevant product market is that the

12   products within it are reasonable substitutes for each other

13   from the buyer's point of view; that is, the products compete

14   with each other.  In other words, the relevant product market

15   includes the products and services that a consumer believes

16   are reasonably interchangeable or reasonable substitutes for

17   each other.  This is a practical test with reference to the

18   actual behavior of buyers and marketing efforts of sellers.

19        Thus, for example, if consumers seeking to cover leftover

20   food for storage considered certain types of flexible wrapping

21   material--such as aluminum foil, cellophane, or even plastic

22   containers--to be reasonable alternatives, then all of those

23   products may be in the same relevant product market.  Products

24   or services need not be identical or precisely interchangeable

25   as long as they are reasonable substitutes.

1  To determine whether products are reasonable substitutes

2  for each other, you must consider whether a small but

3  significant and non-transitory increase in the price of one

4  product would result in enough customers switching from that

5  product to another product such that the price increase would

6  not be profitable.  In other words, will customers accept the

7  price increase or will so many switch to the alternative

8  products that the price increase will be withdrawn?

9  Generally speaking, a small but significant and

10 non-transitory increase in price is approximately a 5 percent

11 increase in the price not due to cost factors, but you may

12 conclude in this case that some other percentage is more

13 applicable to the product at issue.

14 If you find that customers would switch and that the

15 price increase would not be profitable, then you must conclude

16 that the products are in the product market.  If, on the other

17 hand, you find that customers would not switch, then you must

18 conclude that the products are not in the product market.

19 In evaluating whether various products are reasonably

20 interchangeable or reasonable substitutes for each other under

21 the price increase test I've just given you, you may also

22 consider the following:

23 Consumers' views on whether the products are

24 interchangeable;

25 The relationship between the price of one product and

1     sales of another;

2         The presence or absence of specialized vendors;

3         The perceptions of either industry or the public as to

4     whether the products are in separate markets;

5         The views of CosMX and ATL regarding who their respective

6     competitors are; and

7         The existence or absence of different customer groups or

8     distribution channels.

9         In deciding whether CosMX has proven a relevant product

10     market, you may also consider what the law refers to as the

11     cross-elasticity of supply, or, in other words, the extent to

12     which the producers of one product would be willing to shift

13     their resources, such as intellectual property, manufacturing

14     facilities, or personnel to producing another product in

15     response to an increase in the price of the other product.

16         Such producers, to the extent that they exist, can

17     increase supply and, therefore, drive prices back to

18     competitive levels, defeating any effort by a would-be

19     monopolist to charge significantly higher prices.

20         Take two shoe manufacturers, for example.  The first

21     manufacturer produces shoes for women, while the second

22     manufacturer produces shoes for men.  Generally speaking,

23     men's and women's shoes are not reasonably interchangeable

24     and, therefore, might be thought of as being in separate

25     product markets.

1    However, if it is possible that the men's shoe

2  manufacturer could quickly shift its resources to start

3  producing women's shoes if the women's shoe manufacturer

4  raised its prices significantly and vice versa, although women

5  would not buy men's shoes, nor would men by women's shoes, the

6  ability of each manufacturer to alter its production could

7  prevent the other manufacturer from raising prices

8  significantly.  Thus, in this example, men's and women's shoes

9  would be included in the same market.

10    If, in determining the products in the relevant product

11  market, you find that there are manufacturers that have the

12  ability to alter their production to manufacture products that

13  can be reasonably substituted with ATL's, even though they do

14  not presently compete with ATL or CosMX, you may consider

15  whether the existence of these potential alternative suppliers

16  can influence the prices that ATL charges for its product and,

17  if so, that amount of the product that these suppliers are

18  likely to produce.

19    However, if you find that there are no others who would

20  switch production to products that would compete with ATL's or

21  CosMX's, you may define the market solely on your evaluation

22  of whether the existing allegedly competing products are

23  reasonable substitutes for each other.

24    For its antitrust claim, CosMX contends that there are

25  two relevant product markets:  (1) the market for soft pouch

1  lithium-ion batteries used in smartphones; (2) the market for

2  soft pouch lithium-ion batteries used in laptops.  In

3  contrast, ATL contends that CosMX has failed to prove the

4  relevant product markets it alleges.

5       ATL contends that a properly defined relevant market

6  includes all soft pouch lithium-ion batteries used in consumer

7  electronics generally, and that CosMX fails to consider that

8  manufacturers of lithium-ion batteries for other products

9  could switch to manufacturing lithium-ion batteries for

10 laptops, could switch to manufacturing lithium-ion batteries

11 for laptops and smartphones.  You should evaluate the

12 remainder of CosMX's claim based on the relevant market or

13 markets that you determine.

14      The relevant geographic market is the area in which ATL

15 faces competition from other firms that compete in the

16 relevant product market and to which customers can reasonably

17 turn for purchases.  In this case, the parties agree that the

18 relevant geographic market is global.

19      If you find that CosMX has proven that a relevant

20 market -- proven a relevant market, you must then decide

21 whether ATL had the specific intent to monopolize that market.

22 In other words, you must decide if the evidence shows that ATL

23 acted with the conscious aim of acquiring the power to control

24 prices and to exclude or destroy competition in the relevant

25 market.

1    Accordingly, the evidence that any particular act was

2    engaged in by ATL would not be sufficient in and of itself on

3    the issue of an attempt to monopolize unless you find that

4    such act was done by reason of a specific intent to injure or

5    destroy competition or to control prices.

6    Now, there are several ways in which CosMX may prove that

7    ATL had the specific intent to monopolize.  There may be

8    evidence of direct statements of ATL's intent to obtain a

9    monopoly in the relevant market.

10    Specific intent may also be inferred from what ATL did.

11    For example, if the evidence shows that ATL lacked a genuine

12    business justification and the natural and probable

13    consequence of ATL's conduct in the relevant market was to

14    give ATL control over prices and to exclude or destroy

15    competition, and that this was plainly foreseeable by ATL,

16    then you may, but you're not required to, infer that ATL

17    specifically intended to acquire monopoly power.

18    However, if you find that ATL in its business practices

19    was predominantly motivated by legitimate business aims and

20    that there was no specific intent to control prices or to

21    injure or destroy competition in an applicable part of the

22    alleged relevant market, then you would find against CosMX on

23    the question of an attempt to monopolize.

24    If you find that ATL had the specific intent to achieve

25    monopoly power in a relevant market and engaged in

anti-competitive conduct, you also must determine if the
evidence shows the next element of attempt to monopolize,
namely, that there was a dangerous probability that ATL would
succeed in achieving monopoly power if it continued to engage
in the same or similar conduct.

Monopoly power is the power to control prices, restrict
output, and exclude competition in a relevant antitrust
market.  More precisely, a firm that becomes a monopolist if
it obtains the ability to profitably raise prices
substantially above the competitive level for a significant
period of time.

In determining whether there was a dangerous probability
that ATL would acquire the ability to control price in the
market, you should consider such factors as:

ATL's market share;

The trend in ATL's market share;

Whether the barriers to entry into the market made it
difficult for competitors to enter the market;

The likely effect of any anti-competitive conduct on
ATL's share of the market.

Now, the first factor that you should consider is ATL's
share of the relevant market.  Based on the evidence that
you've heard about ATL's market share, you should determine
ATL's market share as a percentage of the total sales or
shipments in the relevant market.  ATL must have a significant

1 share of the market in order to possess monopoly power, but

2 only a lesser share of the market is required where, as here,

3 the claim is based on attempted monopolization.

4    In evaluating whether the percentage of market share

5 supports a finding of a dangerous probability of achieving

6 monopoly power, you also should consider other aspects of the

7 relevant market, such as market share trends and the existence

8 of barriers to entry (that is, how difficult is it for other

9 producers to enter the market and begin competing with ATL for

10 sales), along with ATL's market share.

11    These factors should inform you as to whether ATL has a

12 dangerous probability of achieving monopoly power.  The higher

13 the company's share, the higher the likelihood that a company

14 has a dangerous probability of obtaining monopoly power.

15    A market share below 10 percent is ordinarily not

16 sufficient to support a conclusion that a party has monopoly

17 power, but a market share of 20 percent or greater can support

18 an attempted monopolization claim.  To have a dangerous

19 probability of obtaining market power, ordinarily a party

20 would be required to have a dangerous probability of obtaining

21 a market share of 50 percent or greater.

22    However, if you find that the other evidence demonstrates

23 that a party would, in fact, have a dangerous probability of

24 obtaining monopoly power even if its market share would be

25 below 50 percent, you may conclude that the party has a

1   dangerous probability of obtaining monopoly power.

2       Nevertheless, the market shares between 17 and 25 percent

3   are legally insufficient to uphold a finding of monopolization

4   absent other compelling evidence that the party had monopoly

5   power.

6       The trend in ATL's market share is something you may

7   consider.  An increasing market share may strengthen an

8   influence that a company has a dangerous probability of

9   obtaining monopoly power, particularly where that company has

10  a high market share, while a decreasing share might show that

11  a company does not have a dangerous probability of obtaining

12  monopoly power.

13      You may also consider whether there are barriers to entry

14  into the relevant market.  Barriers to entry make it difficult

15  for new competitors to enter the relevant market in a

16  meaningful and timely way.  Barriers to entry might include

17  intellectual property rights (such as patents or trade

18  secrets), the large financial investment required to build a

19  plant or satisfy governmental regulations, specialized

20  marketing practices, and the reputation of the companies

21  already participating in the market (or the brand name

22  recognition of their products).

23      Evidence of low or no entry barriers may be evidence that

24  ATL does not have monopoly power, regardless of ATL's market

25  share, because new competitors could enter easily if ATL

attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that ATL has monopoly power.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that ATL would ultimately acquire monopoly power.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that ATL would ultimately acquire monopoly power.

If you find that ATL has violated the antitrust laws, then you must decide if CosMX is entitled to recover damages from ATL.

CosMX is entitled to recover damages for an injury to its business or property if it can establish three elements:

1.  CosMX was in fact injured as a result of ATL's alleged violation of the antitrust laws;

2.  ATL's alleged illegal conduct was a material cause of CosMX's injury; and

3.  CosMX's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as injury in fact or fact of damage.  For CosMX to establish that it is entitled to recover damages, it must prove that it was injured

as a result of ATL's alleged violation of the antitrust laws.

Proving the fact of damage does not require CosMX to prove the

dollar value of its injuries.  It requires only that CosMX

prove that it was, in fact, injured by ATL's alleged antitrust

violation.

If you find that CosMX has established that it was in

fact injured, you may then consider the amount of CosMX's

damages.  It's important to understand, however, that injury

and amount of damage are different concepts and that you

cannot consider the amount of damage unless and until you have

concluded that CosMX has established that it was in fact

injured.

CosMX must also offer evidence that establishes by a

preponderance of the evidence that ATL's alleged illegal

conduct was a material cause of CosMX's injury.  This means

that CosMX must have proved that some damage occurred to it as

a result of ATL's alleged antitrust violation and not some

other cause.

Cosmx is not required to prove that ATL's alleged

antitrust violation was the sole cause of its injury; nor need

CosMX eliminate all other possible causes of injury.  It's

enough if CosMX has proved that the alleged antitrust

violation was a material cause of its injury.

Finally, CosMX must establish that its injury is the type

of injury that the antitrust laws were intended to prevent.

1   This is sometimes referred to as antitrust injury.  If CosMX's

2   injuries were caused by a reduction in competition, acts that

3   would lead to a reduction in competition, or acts that would

4   otherwise harm consumers, then CosMX's injuries are antitrust

5   injuries.

6       On the other hand, if CosMX's injuries were caused by

7   heightened competition, the competitive process itself, or by

8   acts that would benefit consumers, then CosMX's injuries are

9   not antitrust injuries and CosMX may not recover damages for

10  those injuries under the antitrust laws.

11      You should bear in mind, ladies and gentlemen, that

12  businesses may incur losses for many reasons that the

13  antitrust laws are not designed to prohibit or protect

14  against--such as where a competitor offers better products or

15  services, or where a competitor is more efficient and can

16  charge lower prices and still earn a profit.  The antitrust

17  laws do not permit a party to recover damages for losses that

18  were caused by the competitive process or conduct that

19  benefits consumers.

20      If you find that ATL violated the antitrust laws and that

21  this violation caused injury to CosMX, then you must determine

22  the amount of damages, if any, that CosMX is entitled to

23  recover.  And the fact that I'm giving you instructions

24  concerning the issue of CosMX's damages does not mean that I

25  believe CosMX should or should not prevail in this case.  If

1  you reach a verdict for ATL on the issue of liability, you

2  should not consider the damages, and you may disregard the

3  damages instruction that I'm about to give.

4      The law provides that CosMX should be fairly compensated

5  for all damages to its business or property that were a direct

6  result or a likely consequence of the conduct that you have

7  found to be unlawful.

8      Antitrust damages are only compensatory, meaning their

9  purpose is to put an injured party as near as possible in the

10  position that it would have been had the alleged antitrust

11  violation not occurred.  The law does not permit you to award

12  damages to punish a wrongdoer---what we sometimes refer to as

13  punitive damages--or to deter particular conduct in the

14  future.

15      You are permitted to make just and reasonable estimates

16  in calculating CosMX's damages.  You are not required to

17  calculate damages with mathematical certainty or precision.

18  However, the amount of damages must have a reasonable basis in

19  the evidence and must be based on reasonable, non-speculative

20  assumptions and estimates.  Damages may not be based on

21  guesswork.  CosMX must prove the reasonableness of each of the

22  assumptions upon which their damages calculation is based.

23      If you find that CosMX has provided a reasonable basis

24  for determining damages, then you may award damages based on a

25  just and reasonable estimate supported by the evidence.

1    If you find that CosMX has failed to carry its burden of

2    providing a reasonable basis for determining damages, then you

3    may not award damages or you may award nominal damages, not to

4    exceed one dollar.

5    If you find that ATL violated the antitrust laws and that

6    CosMX was injured by that violation, CosMX is entitled to

7    recover for such injury that was the direct result or likely

8    consequence of the unlawful acts of ATL.  CosMX bears the

9    burden of showing that its injuries were caused by ATL's

10   antitrust violation, as opposed to any other factors.

11   If you find that CosMX's alleged injuries were caused in

12   part by ATL's alleged antitrust violation and in part by other

13   factors, then you may award damages only for that portion of

14   CosMX's alleged injuries that was caused by ATL's alleged

15   antitrust violations.

16   CosMX claims that it was harmed in two the ways.  First,

17   CosMX claims that it suffered increased costs from legal and

18   investment advisors to respond to ATL's Chinese patent threat

19   letter and get its IPO approved by regulators.  Secondly,

20   CosMX claims that it suffered diminished value of its IPO

21   because of the delay caused by ATL's alleged antitrust

22   violation.

23   Atl claims that neither of these claimed categories of

24   damages are due to any actual or potential harm to

25   competition, and that these claimed damages are instead (1)

1  due to decisions and market factors completely outside of

2  ATL's control, (2) are speculative and unsupported, and (3)

3  are due to such factors as independent decision making by the

4  underwriters of CosMX's IPO and stock market fluctuations that

5  have nothing to do with ATL.

6       The presence of these factors does not mean CosMX did not

7  suffer antitrust injury, but CosMX may only recover for

8  damages caused by the alleged antitrust violation.

9       CosMX bears the burden of proving damages by a

10 preponderance of the evidence, including apportioning damages

11 between the lawful and unlawful causes.  If you find that

12 CosMX was injured by ATL's alleged antitrust violation, and

13 there is a reasonable basis to apportion CosMX's alleged

14 injury between lawful and unlawful causes, then you may award

15 damages.

16      If you find that CosMX's alleged injuries were caused by

17 factors other than ATL's alleged antitrust violation, then you

18 must return a verdict for ATL.

19      If you find that there is no reasonable basis to

20 apportion CosMX's alleged injury between lawful and unlawful

21 causes, or that apportionment can only be accomplished through

22 speculation or guesswork, then you may not award any damages

23 at all.

24      If you find that ATL committed an antitrust violation and

25 that this violation caused injury to CosMX, you now must

1  calculate the losses, if any, that CosMX incurred as a result

2  of ATL's antitrust violation.

3      CosMX may not recover damages for any portion of its

4  injuries that it could have avoided through the exercise of

5  reasonable care and prudence.  CosMX is not entitled to

6  increase any damages through inaction.

7      The law requires an injured party to take all reasonable

8  steps it can to avoid further injury and thereby reduce its

9  loss.  If CosMX failed to take reasonable steps available to

10 it, and the failure to take those steps resulted in greater

11 harm to CosMX than it would have suffered had it taken those

12 steps, then CosMX may not recover any damages for that part of

13 the injury it could have avoided.

14     ATL has the burden of proof to show that CosMX failed to

15 take reasonable measures to limit its damages.  To do so, ATL

16 must prove by a preponderance of the evidence that CosMX:

17     1.  Acted unreasonably in failing to take specific steps

18 to minimize or limit its losses;

19     2.  That the failure to take those specific steps

20 resulted in losses being greater than they would have been had

21 it taken such steps; and

22     3.  The amount by which CosMX's loss would have been

23 reduced had CosMX taken those steps.

24     In determining whether CosMX failed to take reasonable

25 measures to limit its damages, you must remember that the law

does not require CosMX to take every conceivable step that
might reduce its damage.  The evidence must show that CosMX
failed to take commercially reasonable measures that were open
to it.

Commercially reasonable measures mean those measures that
a prudent businessperson in CosMX's position would likely have
adopted, given the circumstances as they appeared at that
time.  CosMX should be given wide latitude in deciding how to
handle the situation, so long as what CosMX did was not
unreasonable in light of the existing circumstances.

Now, at this point, ladies and gentlemen, we're going to
transition and hear closing arguments for the attorneys for
the competing parties.

The Plaintiff may present its first closing argument to
the jury at this time.

Would you like a warning on your time, Mr. Powell?

MR. POWELL:  Thank you, Your Honor.  I would like
you to let me know if I make it to 10 minutes, please.

THE COURT:  If you get to 10 minutes, I will tell
you.

MR. POWELL:  Thank you.  I appreciate it.

THE COURT:  You may proceed when you're ready.

MR. POWELL:  Good morning, ladies and gentlemen.
It's nice to have a chance to talk with you-all again
directly.

1    My colleague, Mr. Adam Wolfson, and I look forward to

2    summarizing our case to you this morning.  But before I do

3    that, I just want to thank you for the time that you've taken

4    away from your lives to be here this past week.

5    I've seen that you've all been taking notes and paying

6    attention to what the lawyers and the witnesses are doing, and

7    I know that we've given you a lot of information over the

8    course of the last week, and I just want to thank you again.

9    This matter is obviously very important to my client ATL and

10   to the ATL witnesses we were able to present live during this

11   trial.  And so we certainly appreciate your attention.

12   Next slide, please.

13   Now, just to sort of reset here, when we first introduced

14   you-all to ATL last Thursday, we started by giving you a

15   little bit of ATL's story, how the company started in 1999 and

16   saw an opportunity for what we've talked about this week,

17   pouch-type lithium-ion batteries.

18   Now, ATL believed having patent protection was critical

19   to building long-lasting value and the founders of ATL valued

20   innovation above all else.  So they identified an American

21   innovation company, Bellcore, that was part of the Bell system

22   companies right here in Texas.  You see, Bellcore was doing

23   fundamental research, and they had a sizable patent portfolio

24   related to early pouch battery technology, but they had not

25   yet commercialized it.

1    And as you heard from Mr. Joe Lam, a senior ATL and TDK

2    executive who's been with us all week during trial, you heard

3    Joe Lam explain that ATL from the beginning had great respect

4    for innovation and for intellectual property and that ATL

5    approached Bellcore to license its patent portfolio.  And

6    within just two years of licensing that portfolio, ATL was

7    successful in commercially manufacturing and selling millions

8    of devices.  And ATL paid Bellcore millions of dollars for

9    that license.

10    Frankly, this story should have replayed itself here.

11    CosMX has known since the first day it entered the lithium-ion

12    battery industry that ATL held the innovation leadership

13    position and had built a substantial patent portfolio.  But

14    CosMX never asked for a license.  Instead, CosMX just decided

15    to imitate ATL's technology and compete by hiring away its key

16    engineers, reverse engineering its products, and imitating its

17    patents.

18    The fact is that had CosMX been willing to negotiate in

19    good faith with ATL when ATL offered CosMX a license back in

20    June of 2021, we would not be here before this Court and you

21    ladies and gentlemen of the jury.

22    Atl offered different licensing packages ranging from 5

23    to 12 percent with the higher royalty packages, including a

24    license to ATL's entire worldwide patent portfolio for all

25    smartphone and laptop and related consumer products, but CosMX

1  refused even to provide a counteroffer.

2      Instead, CosMX put up superficial arguments and asked for

3  additional information that it either did not need to evaluate

4  the infringement assertions that ATL had made or that it knew

5  ATL did not have.  As it turns out, we now know these road

6  blocks to negotiation were strategic.  CosMX was only

7  interested in delaying those negotiations for as long as it

8  took to get its initial public offering approved.

9      Now, we know this because as soon as that approval came,

10  CosMX stopped responding to emails and basically ghosted the

11  ATL patent licensing team.  So at that point ATL had no other

12  options available to it.  At this point, it knew CosMX was

13  infringing its patents and that it had no intention of

14  stopping.  That is when ATL decided to initiate patent

15  infringement lawsuits in several countries, including this

16  lawsuit right here in Marshall.

17      Now, you-all might be curious why is this case between

18  two Chinese companies here in Marshall.  Well, first, this may

19  come to some of you as a surprise, but for what my team does,

20  patent litigation, Marshall is our Grand Ole Opry.  It's our

21  Broadway, if you will.  The best lawyers come to Marshall to

22  try the most important patent cases in the country, and that

23  is no exaggeration.

24      Now, Mr. Lam explained part of the reason ATL came to the

25  United States and to Marshall in the first place, ATL has

1  United States patents because patents can only be enforced in

2  the country in which they issued.  So because ATL wants patent

3  protection in the United States, as well as in Europe and

4  Asia, ATL filed certain patents in many different countries.

5       Next slide.

6       And as you have also heard during this trial, the United

7  States is the largest market in the world for consumer

8  products that use lithium-ion batteries.  So it makes sense

9  for ATL to have patent protection here since so many of the

10  lithium-ion batteries made in China come here in devices made

11  by America's biggest tech companies like       and

12            and      .

13       And I hope, ladies and gentlemen, that you saw through

14  some of the shell game that was going on during trial about

15  whether CosMX knows who its suppliers are, whether it has

16  documentation regarding the technical details of its own

17  products, and whether it knows how many of its own products

18  make it to the United States.

19       None of their excuses are credible or supported by any

20  testimony or evidence.  It's just arguments generated to try

21  to confuse all of you and escape for a little longer the hard

22  reality that CosMX needs to take a license to ATL's patents if

23  it wants to keep using them.

24       Next slide.

25       Now, just to recap the ATL witnesses that presented live

1    testimony in support of the patent infringement case, you will

2    recall that for the '987 separator patent on the left, ATL

3    presented expert opinion and analysis from Dr. Troy Hayes.

4    And it presented the invention story for that patent through

5    its own Mr. Xinghua Tao, who came here from China to offer his

6    support.

7        For the '363 electrolyte recipe patent on the right-hand

8    side, ATL presented expert opinion and analysis from Dr. Steve

9    Martin, and it presented the invention story through ATL's own

10   Dr. Fei Wu.

11       Finally, in the middle for the '352 notch electrode

12   groove patent, ATL presented opinion and analysis from Mr.

13   Hruska, and it presented the invention story through ATL's own

14   Mr. Peipei Guo.

15       Next slide, please.

16       Now, ladies and gentlemen, the Court has instructed you

17   that there are four sources of evidence, and one of them is

18   applicable presumptions.  And as you might remember from the

19   patent video or the Court's charge, patents are entitled to a

20   presumption of validity.  Why?  Because patents that issue

21   have already been through the Patent Office.  And like you

22   heard in the video that the Court showed you, the Patent

23   Office works very hard to evaluate patents and does a good job

24   making sure that the patents it issues should have issued in

25   the first place.

1    And you also heard from the Court's instructions that

2  CosMX has the burden of proving invalidity by what's called

3  clear and convincing evidence, meaning that CosMX must present

4  evidence that leaves you with a firm belief and conviction

5  that it has highly -- it is highly probable that the factual

6  contentions of the claim or defense are true.  And ATL submits

7  that CosMX cannot meet the heightened burden.  And if you have

8  any lingering doubts, the presumption of validity must stand.

9    Next slide, please.

10    Now, I prepared a demonstrative to help you make sense of

11  all this and to help add some context to something that you

12  heard yesterday during Doctor Hayes' cross examination.

13    Now, Doctor Hayes was asked by Defense counsel on cross

14  examination, how could it be that the very same type, quality,

15  and weight of evidence that he reviewed and relied on to prove

16  infringement by a preponderance of the evidence could not also

17  be used by the Defense to meet its burden of proving

18  invalidity by clear and convincing evidence.

19    Well, on the screen I've depicted two cars on their way

20  to the '987 Patent, which for CosMX and its expert Doctor

21  Lucht is up on top of a fairly sizable hill; whereas, for

22  ATL's expert, Doctor Hayes, who is in the same exact type,

23  quality, and weight of car as Doctor Lucht, but his

24  destination to the '987 patent is just slightly elevated from

25  its starting place.

1   Now, as I start the animation, I want you to watch the

2   gas gauge.  At the beginning, you can see the gas gauges are

3   exactly the same.  Now, each vehicle is identical to the

4   other.  Let's see what happened.  Right?  Each vehicle is

5   identical to the other and each started with 10 gallons of

6   gas.

7   Here at the end of the animation--if you could run it

8   through to the end--you see Doctor Lucht did not make it to

9   his destination whereas Doctor Hayes did.  This is because

10  Doctor Lucht's car had a much steeper incline to overcome and

11  the engine had to work harder and use more gas than Doctor

12  Hayes' did.

13  This is how different burdens of proof can render the

14  same evidence sufficient for proving infringement but

15  deficient for proving invalidity.

16          THE COURT:  You used 10 minutes, counsel.

17          MR. POWELL:  Okay.  In that case, Your Honor, I

18  think I'll pass my time to Mr. Wolfson who's going to handle

19  the other part of the case.  Thank you.

20          THE COURT:  All right.  You may continue with

21  Plaintiff's first closing, Mr. Wolfson.  Would you like a

22  warning on the time you use?

23          MR. WOLFSON:  Ten minutes as well, Your Honor.

24          THE COURT:  When you've reached 10 minutes.

25          MR. WOLFSON:  Thank you.

1    THE COURT:  Proceed.

2    MR. WOLFSON:  Ladies and gentlemen, let's talk about

3 CosMX's counterclaim.  As you heard the Court mention, there

4 is a very high burden that they need to get at from the very

5 beginning, and that's rooted in the Constitution.  It's rooted

6 in free speech.

7    When someone has a patent, we want to make it

8 intentionally difficult for them to say that you can't

9 complain to them about infringing their patent.  So that is

10 why in the first instance they have to prove by clear and

11 convincing evidence, first, that ATL's patent assertions were

12 objectively baseless, meaning no reasonable person could ever,

13 ever expect any sort of success on them.

14    And how do we know that they can't prove that and have

15 not proved that?  Well, we are here on one of the patents that

16 were asserted back in June of 2021, aren't we, the '987

17 Patent.  And how do we know they can't prove that?  Well, in

18 China, ATL actually won on one of the patents that it

19 asserted.  Remember, the equivalent of 4.2 million on one

20 patent, one product in China.

21    Now, what you also heard the Court say is that just

22 losing a case is not in and of itself evidence of objective

23 baselessness.  And all they've shown is that a few of the

24 patents were ruled invalid, a few of them were withdrawn, and

25 some of them weren't ever asserted.

1    But what have you not seen?  You haven't seen the

2  patents.  You haven't seen ATL's infringement evidence.  You

3  haven't seen their invalidity arguments.  You haven't seen

4  their prior art arguments.  You haven't seen the decisions

5  from the Chinese courts.  You haven't seen the accused CosMX

6  batteries.  You haven't seen anything.

7    And their own lawyer Wei Liu, remember she got up there

8  on the stand and she said, Well, we could have -- we had the

9  option to claim some kind of abuse of process in China.  But

10  they didn't do it.

11    And then you heard from their lawyer, Roy Liu.  Remember

12  he was the gentleman on zoom, and he said, Well, I think

13  they're -- I think they're objectively baseless.  But he don't

14  know if CosMX infringed the patents.  He didn't know if they

15  were invalid.  He didn't see ATL's infringement evidence.  He

16  didn't provide anything.  And this is their burden.  They got

17  to get over that clear and convincing burden just to get to

18  the rest of their claims.

19    And then what else do we know?  Well, we know they had

20  five separate meetings over two months on these patents.  If

21  they were so obviously baseless, why did they try to settle

22  them for two months?  Well, as we know, they are trying to

23  extend it out until they got their IPO approved.  But why

24  didn't they just say, We're not talking about this?  They

25  can't get over this hurdle.

1    But then the second part is this whole subjective intent

2  to directly interfere with a competitor's business.  What do

3  we know from the evidence?  ATL said, Hey, we want to keep

4  this confidential.  Hey, we're not going to sue you until

5  after your IPO is over.  Does that sound like trying to

6  interfere with someone's business?

7    Now, then if you try to get -- if you can even get over

8  the free speech hurdle, then you get to the point of an intent

9  to monopolize, a specific intent to monopolize the market.

10  Remember, it's not just about a competitor.  It's about

11  competition.  ATL didn't sue LG, Samsung, BYD, Sunwoda, EVE,

12  High Power, any of the other competitors that you saw in the

13  market again and again and again.

14    What we didn't see is any evidence that even if CosMX had

15  been impaired in any way, that the brand customers with all of

16  their smartphones and laptops with these batteries would have

17  anything less than three, four, five other current suppliers

18  for their products.

19    And what we also didn't see is anything from Doctor

20  Maness saying CosMX would have ever been harmed.  Remember one

21  of my very first questions, I said, If they had to pay a

22  royalty and raise their price, would they be unable to

23  compete?  And he said, No, they'd be fine.  And I asked him,

24  Well, did they lose any customers from ATL's assertions?  No.

25  Did -- would they have lost any customers from them?  No.

1    How's that harm to CosMX, let alone harm to competition?

2    And how does that show a dangerous probability of obtaining

3    some kind of monopoly power when CosMX can still compete and

4    every single other competitor can still compete?

5    And then what you also heard from the Judge is that this

6    isn't -- well, the law is that for an antitrust claim, if

7    everything happens overseas, if your injury happens overseas,

8    if it's not directed at the U.S., it's not a U.S. antitrust

9    claim.

10    So let's go over their theory.  The Chinese counterclaim

11    Plaintiff receives infringement letters in China, that then

12    asks -- that then leads to regulators in China asking

13    questions, that supposedly leads to a delay of a Chinese IPO,

14    that supposedly means that they get less money in Chinese

15    yuan, that supposedly prevents them from buying land in China

16    to manufacture battery cells in China to sell to other Chinese

17    companies.  I don't hear anything about the U.S. there.

18    And when I asked Doctor Maness, I said, Well, did you

19    trace how prices would have changed from CosMX to the pack

20    house to the contract manufacturers to the brand customers, he

21    says, No.  So he didn't offer any evidence that the price of

22    your iPhone is going to go up or the price of your laptop is

23    going to go up.  He didn't offer any evidence.

24    And then this damages theory, I mean, I don't know where

25    to start with that.  Let's think about their theory.  The

1  Chinese patent assertions and only the Chinese patent

2  assertions delayed the IPO.  But what do we know from the

3  evidence was parallel to the Chinese assertions at every

4  single step of the way?  The U.S. patent assertions.

5      And what did Doctor Maness tell you on the stand

6  yesterday?  Well, those aren't anti-competitive, those didn't

7  delay the IPO.  But they let the regulators know about them at

8  the exact same time, the regulators had questions about them

9  at the exact same time.

10     Remember that August 10th letter and then the August 25th

11 response?  U.S. and Chinese patent assertions at the same

12 time.

13     And what else have we seen?  The regulators had questions

14 about tons of things that had nothing to do with ATL.  Ms.

15 Keke He, remember she was the woman with the glasses kind of

16 looking down at the camera on her zoom depo?  She said, Well,

17 we had questions at the beginning.  And I showed you those

18 questions.  And then on August 10th, we had two out of the

19 three questions that Doctor Maness says delayed the IPO.

20 Nothing to do with ATL.  It was just the regulators asking

21 about something else, and then they answer it.

22     I mean, the delay theory just doesn't hold up, especially

23 because they waited three weeks to even tell the regulators

24 about these infringement contentions.

25     And then this stock market idea.  Well, apparently the

IPO going down is due to the stock market going down. And the theory was, well, had it happened on August 16th, it would have been higher. But Doctor Maness didn't calculate that number. And then when I showed him the stock market, ATL, remember, sent these infringement letters when the stock market was rocketing upward.

So apparently the damages theory is that ATL knew the stock market was going to flatten out and go down, even though Doctor Maness conceded ATL knew nothing about that, doesn't control the stock market, and if the implications of his theory is that ATL by sending the infringement letters when the stock market was going up would somehow benefit CosMX by delaying the IPO because the stock market would keep going up, it just makes no sense.

And remember the whole difference in IPO price is based on what Mr. Alex Li told you they had hoped to get from the IPO a year earlier. Look, I get why an executive at a company would want an IPO price to go higher. But what they hope for? That's not evidence.

When I was 11, I hoped my parents would buy me the bike they promised if I kept my grades up. When I didn't deliver, they didn't get me the bike. Is that harm to me? Did they harm me? No, it's because I didn't deliver.

Now, the same thing is here. They didn't deliver what the underwriters were hoping for. And we saw that again and

1    again.  Regulators asked, well, why do you have 10 percent of

2    the patents that your competitors do And they kept on asking

3    about all these different aspects of their business.  There

4    was the Maxell litigation that was also publicly known,

5    publicly disclosed, another reason that the IPO price could

6    have gone down.  They haven't assessed any of that.

7        Look -- and then this mitigation idea, this idea that

8    they could have taken reasonable steps to, quote, you know, to

9    avoid some of their harm.  Well, they could have let the

10   regulators know earlier.  Right?  And then if this IPO was so

11   important to have done in a good stock market environment, why

12   not just wait?  Right?

13       If -- so, ladies and gentlemen, this is -- it reminds me

14   of a dog bite case.  You walk outside; your neighbor's dog

15   comes up and bites.  You go over to him and say, look, you owe

16   me my medical bills.  And he says, well, I don't have a dog.

17   You prove he's got a dog.  He says, well, my dog didn't bite

18   you.  You prove his dog bit you.  Well, it wasn't that bad.

19   You prove it's that bad.  Well, it's your fault.  That's what

20   this claim is about.  They're just trying to shift the

21   attention.

22       As I mentioned before, last week on Thursday, this

23   counterclaim is just going to show again and again that what

24   this is really about is CosMX trying to avoid paying its fair

25   share.  We believe through all this evidence and through their

1  compete lack of evidence, their inability to get over that

2  clear and convincing free speech hurdle, their inability to

3  show any of the elements to show even that this should be in

4  the U.S., well, I think we think that we've established that.

5      Now --

6          THE COURT:  Ten minutes have been used.

7          MR. WOLFSON:  Thank you, Your Honor.

8      As Mr. Powell said, we really appreciate your time and

9  all the attention you've given this week.  We know it's a lot.

10  And so I just want to say thank you.

11     And at this point CosMX's attorney is going to get up and

12  talk to you, and then we're going to have an opportunity to

13  come back and finish that out.  So until we speak again, thank

14  you.

15         THE COURT:  All right.  The Defendant may now

16  present its closing argument to the jury.

17     Mr. Ivey, would you like a warning on your time?

18         MR. IVEY:  Yes, Your Honor.  I'd appreciate eight

19  minutes.

20         THE COURT:  I'll warn you when you have eight

21  minutes remaining.

22         MR. IVEY:  Thank you.

23         THE COURT:  You may proceed.

24         MR. IVEY:  Thank you.

25     Well, good morning, ladies and gentlemen.  This is the

last opportunity I'll have to talk with you, and I want to

thank you again for your taking the oath and for your paying

such close attention to what we've had to say and for joining

us in this investigation into this very important case.

Now, I began by making certain promises, one of which was

that we would be investigating together ATL's allegations with

regard to patent infringement in this case.  Remember they

have the three patents.  We'll go over that.

This is essentially a matter of promises made and

promises kept.  We have shown that the patents that are

asserted in this case are invalid and that CosMX does not

infringe these patents.

We started with a little bit about the company CosMX.  It

has the impressive story of innovation that you've heard.  We

began R&D research and development in lithium-ion batteries in

1998.  We have three production facilities.  We have talented

research and development engineers and technicians, and we

have been competing on technology, quality, and price, and

we've been competing effectively, which is why we got ATL's

attention in the way that we did.

Now, the in-house technology we have has been proven to

you by Dr. Suli Li, who came here, took the oath, and talked

to you about the work she's done over the last eight years at

CosMX.  She told you that she came from ATL before she became

the director of fundamental research at CosMX.  But the other

1    thing she did was she looked you-all in the eye and she told

2    you that, when she left ATL, she did not take any proprietary

3    information with her, nobody on her team has ever tried to

4    access proprietary information from ATL, and no one at ATL has

5    ever complained to her about taking proprietary information.

6    That was live, under oath testimony in this case.

7        She also explained how the department and the division

8    has grown over the years, competed effectively, and been

9    recognized for its accomplishments, including the recognition

10   from the lithium-ion batteries and innovations authorities for

11   the first prize of Science and Technology Progress Award in

12   2022.

13       Ladies and gentlemen, it's been an impressive story of

14   competing, growing, and innovating at CosMX, and Doctor Li

15   talked to you about that.

16       We also told you when we started this that one of the

17   things you would see was that, as CosMX has been competing

18   effectively and growing and technologically innovating, CosMX

19   has gotten the attention of ATL.  ATL has been watching, and

20   it has been unhappy about the straight-up competition, and

21   since then, ATL has not been competing fairly against CosMX.

22       And ATL has a problem here, because you've now seen some

23   of the evidence from our investigation right here during this

24   trial.  We've talked about our headquarters, but we've also

25   shown you the evidence with regard to what was going on at

1  ATL.

2      The fact of the matter is the threats have been made and

3  they have followed through on them.  And what you saw when Mr.

4  Lam took the stand was there was an admission of intentional

5  interference with CosMX's IPO.  The question was asked, "And

6  what led you -- what led you to make the decision to file the

7  lawsuits against CosMX?"

8      And his answer was, "Because in 2020 we learned that they

9  were trying to do the IPO and we foresee they will collect

10  more capital from the market and they will expand production

11  and ship more infringing product and causing us more

12  damage."

13      That's the testimony from the executive vice president at

14  ATL.  And we'll come back to that in a bit because there's

15  more we want to show you with regard to that.

16      Now, as we talked to you about this case and as we've

17  investigated together the allegations, you will recall that

18  there was the statement made during the Federal Judicial

19  Center video that it is important for us, CosMX, to have an

20  opportunity to present our case to people like you, members of

21  this jury, because we were not in the room at the time these

22  patents were prosecuted.  This is our place to vindicate the

23  fact that we didn't have an opportunity to comment on these

24  patents and to show why they are invalid.

25      We have the patents that they've asserted:  the '987

1    Patent with the priority date of April 11, 2018, the separator

2    patent; the '363 Patent, with the priority date of September

3    21, 2018, the electrolyte patent; and the '352 Patent, which

4    has the priority date of August 31, 2015, the electrode

5    patent.

6         And one of the things you've seen, ladies and gentlemen,

7    during this case is that we kept our promise during this

8    investigation because we talked to you about the law and we

9    showed you how we've complied with it.

10        In order for someone to be entitled to a patent, the

11   invention must be new, and an invention is new when the

12   identical system or method has not been made, used, or

13   disclosed before.  If an invention is not new, it is

14   considered to be anticipated.

15        And in this case, ladies and gentlemen, that type of

16   anticipated reference could be a single device or it could be

17   a single previous publication or patent that predates the

18   claimed invention.

19        And, ladies and gentlemen, we've shown you categories of

20   prior art, service-single devices and single previous

21   publications or patents in this case, and they fell into three

22   categories--commercial products.

23        You saw the S9 from Samsung and the iPod Touch 6.  You

24   saw the purchased electrolytes which were developed at CosMX

25   and went through the process of offer and sale and have been a

1   commercially-available product for years before the patents

2   were issued here.  And there were also individual publications

3   which individually and together cause us to realize that these

4   patents are invalid.

5        We started with what came before the patents for the '987

6   Patent.  It was the iPod 6 and the Ueki reference.

7   Individually, each of those stands alone to invalidate the

8   patent.  For the '363, there were three individual categories

9   of references--the Samsung S9, the electrolytes that were

10  developed by CosMX, and the Zeng reference.

11       And then for the '352 Patent, we had the Wang and the

12  Deng references which in combination have all of the elements

13  of the '352 Patent.  Each of those stand alone to prove

14  invalidity.

15       Now, you also heard proof positive from Dr. Brett Lucht

16  about each of these categories, the '987 separator patent is

17  invalid and not infringed; the '363 Patent, the electrolyte

18  patent, is invalid and not infringed; and the '352 electrode

19  patent is invalid and not infringed.  He showed you the

20  evidence in great detail with regard to why he came to those

21  conclusions after thorough investigation and testing through

22  his own work and through his work with independent

23  laboratories.  And the evidence, ladies and gentlemen, has

24  been clear and convincing in this regard.

25       Let's start with another overview of the individual

1    patents starting with the '987 Patent.  We have as prior art

2    Ueki and the iPod Touch 6 battery.  And for the Ueki

3    reference, that was November 17, 2015.  It came before the

4    '987 Patent and the iPod Touch 6 battery, January 2017, made

5    and sold by CosMX, also before the date the priority date for

6    the '987 Patent.

7         We took a close look at the separator patent and found it

8    to be anticipated and invalid because when we looked at the

9    battery of the iPod Touch 6, it anticipated claims 1 and 7

10   [sic], the only claims that are asserted here.  And we showed

11   you that the battery was made in 2017 January, more than a

12   year before the '987 Patent's April 11, 2018, priority date.

13        We also showed you the serial number for that battery so

14   we could track it.

15        And these facts are undisputed, ladies and gentlemen.

16   This is prior art, this phone was in use, and it had this

17   battery with that date.

18        We showed you the sales, the shipment and delivery slips

19   for this type of sale.  CosMX sold and shipped the iPod Touch

20   6 cells in January of 2017.  You see the same serial numbers

21   and the same specification models that we showed you with

22   regard to the iPod Touch 6 battery just a moment ago.  And you

23   see the delivery date there of January 11, 2017, in the upper

24   right-hand corner there, and we actually showed you the actual

25   sales and shipping slip, which is also shown on the screen

1    here.

2         There was also the EAG Laboratory testing which is an

3    independent and respected laboratory that tested the battery

4    for the iPod Touch 6 and found that it meets all of the

5    claimed ranges with regard to the '987 claim 1 and claim 17.

6    The range there was 0.3 to 3.0, and the iPod Touch battery

7    clearly had information and elements that met all of those

8    specifications.

9         Now, the prior art we showed you was the Ueki reference

10   from November 17 of 2015, and you also had the iPod Touch 6

11   battery.  So those are two sources.  And, once again, we went

12   a little bit more carefully into the Ueki reference and showed

13   the publication date there was December 22 of 2011.

14        Now, there was a suggestion by Doctor Hayes when he put

15   up this cartoon and suggested that Ueki does not disclose the

16   thickness of the porous layer.  This isn't science, ladies and

17   gentlemen, and this is not the experimentation that you

18   deserve from a scientist of supposed character and caliber

19   with regard to this kind of a proceeding.  This is just

20   basically a cartoon and it should be rejected as that.

21        What you saw from Doctor Lucht was an actual review and

22   testing of the tables of information that were supplied in

23   Ueki, including table 1 here, which goes through and handles

24   the issue of thickness, which is the issue that was being

25   concerned about, of the porous layer.

1    And what Doctor Lucht was able to show was that the

2    thickness has shown in the maximum boxes, the rectangles on

3    the left there and underneath the equation here, is -- lines

4    up directly with what's the thickness of the porous layer

5    within claim 1 of the '987 Patent.  And what you see here is

6    that the range, which is supposed to be between 0.3 and 3.0,

7    is in fact within that range, 1.14 to 1.21.  Squarely within

8    the claim range, clearly anticipates claim 1 of the '987

9    Patent.

10    That brought us to the '363 Patent.  And, again, we have

11    the actual physical model of the Samsung S9+.  And the

12    depiction we had takes us inside that battery, and what we see

13    there is that that -- in addition to the other types of prior

14    art, the Samsung battery was sold to AT&T on July 24th, 2018.

15    And we took a look inside the battery, we found the date there

16    that we just talked about, eight months prior to the '363

17    Patent's priority date, and it was sold on the date there of

18    July 24, 2018.  Undisputed.

19    There was also independent laboratory work done by EAG

20    again and evaluated and reviewed by Doctor Lucht.  And what we

21    showed here was that with the -- regard to the electrolyte

22    composition, there is the formula here under '363 claim 1

23    where you have the conditions that have to be met in that

24    second block for 11 percent weight and about eight percent

25    under that, and then 0.3 down below.  And each of those was

1  found by the EAG Laboratory with regard to the Galaxy S9,

2  showing that it meets each of the elements and limitations of

3  claim 1, undisputed with regard to the '363 Patent.

4      Now, we talked a little bit about Doctor Hayes' cartoon

5  because what he was suggesting there was that he really

6  couldn't figure out the thickness because of the hills and the

7  trees and so forth, which have nothing to do with this patent.

8      What Doctor Lucht said in response was that there was no

9  shift in the values.  It is -- the question was asked, "Is it

10  at all possible that the electrolyte that you inspected had

11  been degraded to such an extent that when the phone was

12  actually new, these numbers that you have indicated with the

13  orange triangles that we just saw could have been completely

14  off the scales?"

15      And his answer was, "No.

16      "And what's the basis for that opinion, Doctor?"

17      Answer is this, "The ratios that are shown here are not

18  close to the edges.  And any small variation in the

19  electrolyte from the small amounts of the decomposition would

20  not shift these values far enough to take them outside of the

21  range."

22      The last question was, "Doctor, among the research that

23  you've done, have you done research specifically -- have you

24  done specific research on electrolyte composition stability?"

25      And the answer, "Yes, I have."

1    And as you recall from his credentials, his research in

2    this regard is extensive.  It's one of the key and main

3    focuses of the work he does.

4    Now, there was another question raised during the course

5    of the cross examination with Doctor Lucht about the idea that

6    maybe there were examples of problems with the battery.  None

7    of that was borne out by the investigation and the review of

8    the batteries that were tested by the EAG Laboratory which

9    documented exactly what the condition of the battery was, what

10   the phone condition was when they got it and when they opened

11   it, and proceeded to perform the tests.

12   And one of the things that was brought up was this idea

13   of battery swelling.  And what Doctor Lucht explained was, if

14   there's significant decomposition of the electrolyte, it would

15   generate a significant amount of gas and the battery would

16   puff up.  And he gave an example of that which you see here.

17   But that's not an example of the phone that was tested.  The

18   phone that was tested showed no swelling.

19   The other thing Doctor Lucht mentioned, which was part of

20   the scientific investigation here, was that what you can see

21   is that the electrolyte, as it was being extracted, removed by

22   a needle here, has been extracted from the battery and it's

23   colorless, which once again is an indication that there has

24   been no significant electrolyte degradation because, when the

25   electrolyte decomposes, it changes color.  It can go kind of

1  to dark yellow or even to black.  And that hadn't happened

2  here.  You can see the liquid is essentially clear.

3        That's, again, undisputed.

4        And so, ladies and gentlemen, with regard to the '363

5  Patent, it is anticipated and invalid because the elements of

6  the Samsung S9 battery here contain all of the elements that

7  were claimed in claim 1 of the '363 Patent.  The Samsung

8  Galaxy S9 phone and the battery anticipate claim 1 of the '363

9  Patent.

10        The other thing we showed in another independent category

11  of anticipatory art and references is that what was referred

12  to as the DP018 and the SW-E7 electrolytes which were also

13  prior art.  Now, you will recall from Doctor Li that the DP018

14  was actually developed by her and her team at CosMX.  This is,

15  again, before the date of the '363 Patent's earliest priority.

16  And so DP018 was on sale and purchased in large commercial

17  quantities before the priority date of the '363 Patent.

18        Similarly, SW-E7 was also on sale before the priority

19  date of the '363 Patent and the electrolyte formulas were

20  fully described in the relevant purchased emails.

21        Now, there has been an effort, a great effort, much

22  exuberance has been put into the idea of no one knows what's

23  the same or different about these different compounds at

24  CosMX, which is preposterous given the fact that we're talking

25  to Dr. Suli Li, the director of fundamental research there,

1  and she knows exactly what they are.

2      And what she told us was that, with regard to DP018,

3  SW-E7, and DP060, the question was asked, How does SW-E7

4  electrolyte compare with DP018, the one that was clearly made

5  in-house at CosMX, and with DP060 also made in-house?

6      She said, and she was clear, The three electrolytes share

7  the identical formula.

8      Why does CosMX have more than one supplier for the same

9  electrolyte?

10      And the answer was, In our industry, it is very common to

11  have different suppliers for the manufacture of the same

12  identical electrolytes.  This practice is to maintain

13  stability among our supplies and our suppliers.

14      It doesn't mean that just because they have different

15  sales codes, product codes, supplier codes, that they're

16  different electrolytes.  They're simply supplied by different

17  supplier, but the electrolyte is identical in each of these

18  instances.

19      And so knowing that DP018 and SW-E7 share the identical

20  formula, we also showed you emails for the purchase, sale, and

21  shipment offers and the purchases and sales of these

22  electrolytes.  We had the DP018 shown for arrival on April 19

23  of 2018, and we had the purchase department with a subsequent

24  purchase for the SW-E7 electrolyte from a different company

25  with the same formula.

1    And what you have here is you have Tinci was the company

2    that was supplying the DP018 on the top, and Smooth Way was

3    the company that supplied SW-E7 on the bottom, still the same

4    electrolyte.

5    And what was asked of Doctor Lucht was this question,

6    "Now, earlier you said it's your opinion that these

7    electrolytes have the same recipe."

8    And Doctor Li has confirmed that.

9    And then the question was, "Why does the DP018 say .14

10   for the lithium salt, but the SW-E7 says 14 for the lithium

11   salt?"

12   And the answer, which is correct, is that "So these

13   weight values -- so these values are in weight percentages,

14   and .14 is just another way of saying 14 percent."

15   There's nothing nefarious or mysterious about that with

16   regard to these chemists.

17   The other reference we had now was the prior invalidating

18   prior art reference, and this was an invention patent

19   application, the Zeng reference, published on November 9th of

20   2016 and the present invention was clearly for electrolytes.

21   It also has the formula showing, with regard to the

22   electrolyte composition, each of the elements that's there in

23   '363, and you see them checked off on the right side.  And the

24   corresponding colors for trinitrile and the dinitrile are

25   shown in these other boxes, and the PP reference is also shown

1   in the solvent composition on the left side under Zeng.

2       Each of the elements are present in Zeng, and it meets

3   claim 1 of the '363 Patent.  The problem for ATL is it meets

4   it years before ATL supposedly invented this.

5       We then had Doctor Martin compounding his own error with

6   regard to the '363 Patent because he went on to put this

7   second cartoon in front of you which has to do I think with a

8   lemonade pitcher and maple syrup.

9       And what he said was, You wouldn't be able to follow the

10  Zeng reference to make the solutions that Zeng is teaching.

11  Is that correct?

12      And he said, No one would be able to follow it.

13      And that, ladies and gentlemen, is scientific nonsense.

14  The fact of the matter is Doctor Lucht followed Zeng exactly

15  from the teachings in the specification of the patent.  And

16  what he told us was that, "So what did you do to determine the

17  weight percentage of propyl propionate relative to the entire

18  electrolyte?"

19      And he said, "So what I did was I went into my laboratory

20  and I prepared the baseline electrolyte formulation as

21  described in the Zeng patent.

22      "Did you follow the steps of Zeng exactly?"

23      And the answer was, "Yes, I followed the steps of Zeng

24  exactly."

25      And from that, we know that Zeng anticipates every

1  element of the claim 1 of the '363 Patent, and it, therefore,

2  invalidates that reference.

3      That brings us to '352.  Now, '352 is the patent that

4  we've asserted obviousness against, and the two references we

5  have in that regard are the Wang reference from November 19 of

6  2014, combined with the Deng reference from September 8 of

7  2010.  Again, far earlier than the actual '352 Patent priority

8  date.

9      What we showed, ladies and gentlemen, during the course

10  of the trial and during our investigation was that Wang, the

11  first reference, had everything in it except the notch which

12  is shown down several lines with the red item here as a first

13  electrode plate notch.  That's not supplied in Wang.

14  Everything else is.  No question about it.  And they're all

15  checked off on the right because they're there.

16      What it doesn't have is supplied by Deng, and that's the

17  notch.  And what you see in the Deng disclosure is making a

18  notch, and it goes on to say that the method here is simple in

19  this technique and it delivers good operational performance.

20  It also says here in the disclosure that it enhances

21  electrical performance of the batteries.

22      So what you see, ladies and gentlemen, when you combine

23  Deng and Wang together, you have all of the elements of the

24  '352 Patent combined.

25      Now, the clear teaching of what you saw here with Deng is

1  evidence of the desirability of combining the two references.

2  And what you get when you add that electrode plate notch is

3  everything that was disclosed in the '352 Patent.  A person of

4  skill in the art would clearly recognize the desirability of

5  this combination and, therefore, it invalidates that

6  reference.

7      The other thing we did, ladies and gentlemen, was talk to

8  you a little bit about non-infringement, and what we've gone

9  back to is the instructions which explain that if a device is

10  missing even one limitation or element, it does not infringe

11  that claim.

12      Now, we start here again with Doctor Martin because ATL

13  did not prove infringement in this matter.  What happened here

14  was you see in some of the diagrams here the raw electrode,

15  which Doctor Martin did review, but then that goes through the

16  process of battery manufacturing facilities for formation and

17  that ultimately turns into the final battery cell of the

18  accused products.

19      And what Doctor Martin admitted was or said was, "As many

20  of the additives are present in relatively small amounts,

21  large changes in their relative concentrations or even changes

22  to their presence entirely can be brought about by various

23  reactions to form the anode and cathode SEIs in these

24  batteries."

25      And so what happened is he didn't actually go through the

1   process of testing through to find out whether what's claimed

2   in the patent, the '352 Patent, is actually present in the

3   final battery cells, because he stopped with the raw

4   electrolytes.

5       That's not scientific, ladies and gentlemen.  Doctor

6   Lucht actually went through the process and found what needed

7   to be found there.

8       Now, the other thing we have and when we look at claim 1

9   of the '352 Patent is we want to recall that there is a

10  reference in the claim to corresponding elements, and these

11  basically were dealt with in the process specifications as the

12  offset grooves and size differences.

13      And what we've found here from the process specifications

14  at CosMX is that by design CosMX's electrodes have a cleaning

15  dislocation, which means the two areas are intentionally

16  mismatched.  We also saw that the directives are that the

17  dimension of the positive electrode cleaning area is to be

18  different on both sides.  In other words, ladies and

19  gentlemen, what actually happens with regard to CosMX's

20  products is not what's claimed in the '352 Patent for

21  corresponding elements.

22      And so what we've shown, ladies and gentlemen, is that

23  the '987 Patent, the '363 Patent, and the '352 Patent are not

24  infringed because the evidence wasn't brought to you by ATL in

25  that regard, and we've shown you where there are departures

1    with regard to elements, and we've also shown you where there

2    was a failure on their part to actually go through the process

3    of trying to prove that what they are looking at actually

4    winds up in CosMX's products.

5         So, in summary, we had claim 1 and 17 of the '987

6    separator patent which we've found to be invalid and not

7    infringed; claim 1 of the '363 electrolyte patent is invalid

8    and not infringed; claim 1 of the '352 Patent, the electrode

9    patent, is invalid and not infringed.

10        Now, that brings us back to the point I made earlier on

11   about ATL having a problem, and the problem is that they've

12   been exposed in their efforts to compete unfairly against us

13   in the marketplace as we've been gaining on them.  And what we

14   know is that anti-competitive acts, other than competing on

15   the merits, would have an effect of preventing or excluding

16   competition or frustrating the efforts of other companies to

17   compete would violate the antitrust laws.  Those are

18   anti-competitive acts.

19        And what we started with here was remember we were

20   beginning to grow fast enough to where it came to a point

21   where CosMX decided that it wanted to go public and actually

22   put out an initial public offering.  And what Mr. Li, the vice

23   president of CosMX, explained under oath was that, okay, and

24   the question here was, "What was CosMX planning to do with the

25   money that it raised in the IPO?"

1    And the answer was, "We planned to use that fund to buy

2  land to set up facilities for the manufacturing and to

3  increasing our manufacturing capability as well as the

4  improvement of our quality and technology development."

5    And this again, ladies and gentlemen, was part of what

6  ATL had been watching and not been happy about.

7    We already talked about the fact that Mr. Lam testified

8  that they -- when CosMX was trying to do the IPO, they

9  basically tried to find ways to frustrate that, including

10  filing lawsuits.  But that wasn't the only thing that they

11  did.  They also contacted the authorities about CosMX's IPO to

12  try to throw a wrench in the spokes of that progress.

13    Now, the other thing that they did was you heard about

14  this idea of them asserting a slew of patents in China as a

15  way of trying to derail CosMX in its progress.  And from the

16  lawyer here, Yanxi Liu, a Chinese patent lawyer, what he

17  explained was that out of the eight purported patents, he

18  found seven of them to be completely baseless and one likely

19  to be baseless.

20    Now, this testimony, ladies and gentlemen, was

21  unrebutted.  There was no lawyer who was an authority on

22  Chinese law who said that Mr. Liu was wrong in this regard.

23  This is uncontested testimony.  And what he's talking about

24  here is that the assertion of these patents was designed to

25  hurt CosMX, to hurt competition, and it was anti-competitive.

1    We also saw the efforts to frustrate CosMX's progress and

2    to delay the IPO, and CosMX's becoming the target of attempted

3    monopolization efforts by ATL.

4            THE COURT:  Eight minutes remaining, counsel.

5            MR. IVEY:  Thank you, Your Honor.

6    We had the graph here for the smartphone soft pouch LIB

7    shipments, ATL versus CosMX, share for Q2021.  And this is a

8    global reference here.  In 2021, ATL had 40 percent and CosMX

9    had 10 percent.  Now, after the efforts to derail CosMX and to

10   hurt competition, both with CosMX and generally, what you see

11   here is for Q22, 2022, Q4 of 2022, ATL's share goes up to 53

12   percent and CosMX's share declines to 7 percent.

13           Ladies and gentlemen, we were clearly hurt by the efforts

14   ATL made to monopolize and to hurt us and to derail our

15   progress with regard to the IPO and our technological advances

16   in the market.  Their efforts to disrupt hit the mark, and it

17   was not only in the smartphone market, they also did the same

18   thing with regard to laptops.

19           We then had the testimony of Keke He, who explained that,

20   "As I mentioned before," the delay was caused by ATL's letter

21   of infringement.  And the delay she's talking about there is

22   the effort for CosMX to complete its IPO.  This was -- the

23   letter that ATL sent triggered the regulatory review and

24   inquiry.  And it, again, hurt CosMX significantly.

25           Now, the harm to CosMX was explained by Doctor Maness, an

antitrust expert, and what he did was he gave us two sets of

numbers of problems.  The first was with regard to the costs,

direct costs, related to the delay, and those were about $3.1

million.  For the patent investigation, IPO fees, he wound up

with $3.1 million.  But his analysis did not stop there and

the damage didn't stop there.

Harm from the delay of the IPO, as Doctor Maness

explained, was that the expected price of the IPO was $490

million.  The actual price received was $341.7 million, with a

shortfall of about $148 million; that, in addition to the $3.1

million that was also out of pocket.

Now, there's no question, ladies and gentlemen, that what

Doctor Maness was explaining was a real harm to CosMX.  It was

intended to harm and it was foreseeable that it would cause

harm.  The antitrust injuries were clear here, and there was

also injury to competition in general.  They hurt our

reputation with this in the market globally and in the United

States.

And while ATL tries now to hide behind market

fluctuations or uncertainties or other smoke and misdirection

that they try to throw up here, they shouldn't be excused for

what they intended to do and what they were able to

successfully do here, which was cause this delay.  And we

don't come here lightly, but we ask you to not let them get

away with this.

1    Now, what we now have, ladies and gentlemen, is I've come

2  to the end of my time talking with you, and we'll be asking

3  you at the close of the case to return your verdict in our

4  favor.  There will be a verdict form which the Court will

5  supervise and you will be given that form.

6    There will be a number of questions on it that we want

7  you to look at carefully with all -- but we start with

8  Question 1, which has to do with whether the Plaintiff by a

9  preponderance of the evidence has proven infringement of the

10  '987 Patent, the '363 Patent, or the '352 Patent.  And the

11  answer for that is no in each case.

12    With regard to our claims that, in fact, we have proven

13  by clear and convincing evidence that each of the patents, the

14  '987 Patent, the '363 Patent, and the '352 Patent, are indeed

15  invalid because they are anticipated or obvious, we ask you to

16  check yes with regard to each of those.

17    And with regard to the antitrust issues, you'll be given

18  a number of instructions, and you've heard from the Court

19  extensively on this.  The questions are whether the Defendant

20  by clear and convincing evidence used the threat of Chinese

21  litigation to objectively and baselessly attempt to interfere

22  directly in the business relationships for CosMX and to harm

23  competition, and the answer to that is yes.  That's exactly

24  what they were doing.  And they knew that they were doing it.

25  They did it on purpose, and as I say, their efforts hit the

1 mark.

2     The other questions you have here are 6[a], [b], and [c]

3 with regard to whether there was an engagement by

4 anti-competitive conduct by ATL.  We believe the proof there

5 is yes.

6     We also think that ATL has been shown to have an intent

7 to achieve monopoly power in the relevant markets.  The answer

8 to that is yes.

9     And whether we should find that ATL's anti-competitive

10 conduct was the proximate harm to CosMX's business and

11 property, the answer, as Doctor Maness explained, is

12 definitely over $150 million in damages in that regard.

13     And so that's one of the other questions you'll be asked

14 with regard to this is, what do you find in damage for the

15 antitrust violations and for the unfair competition.  We ask

16 you to go with Doctor Maness' calculations in that regard.

17     We ask you to vindicate CosMX from the unfair competition

18 and the efforts to derail its fair and impressive track record

19 of competing globally and in the United States by awarding us

20 the findings of not infringing, proving invalidity of these

21 patents, and proving each and every element of the antitrust

22 claims that we've brought here today in this case.

23     The last thing I want to do very quickly, ladies and

24 gentlemen, is actually extend a more heart-felt thank you than

25 I did at the very beginning of this.  I said thank you for

1  your service, and I meant that.  Taking the oath here is

2  extraordinarily important, and we know it's a tremendous

3  disruption to your daily lives.

4      One of the things that I have been impressed with here

5  during the course of our investigation is how diligent you've

6  been, how reliable you've been, how attentive you've been.

7  And we do appreciate you for being here, giving us our day in

8  court, letting us be in the room to talk about these patents,

9  and letting us have our opportunity to right a serious wrong.

10     Thank you.

11     Thank you, Your Honor.

12         THE COURT:  Plaintiffs may now present their final

13  closing.

14     You have 19 minutes and 35 seconds remaining.  Mr.

15  Powell, would you like a warning on your time?

16         MR. POWELL:  Thank you, Your Honor.  At 10 minutes

17  and five minutes, if you would.

18         THE COURT:  Ten minutes remaining and 5 minutes

19  remaining, I will give you those warnings.  You may proceed.

20         MR. POWELL:  Thank you.

21     Now, I want to start by summarizing a few key points of

22  ATL's damages claim.

23     If we could go to the first slide there, Mr. Fisher,

24  12.2.

25         This is for infringement of all three patents.  And

1  fortunately CosMX has made this part of my job a lot easier:

2  One, by agreeing that the appropriate measure of damages in

3  this case is a running royalty; and, two, not presenting any

4  competing opinion as to the proper royalty base for all

5  infringement.

6      If we go to the next slide.

7      In light of this, the verdict form already indicates that

8  the award will be for a running royalty.  And to remind

9  you-all of why, you will recall ATL's damages expert, Mr. Alan

10 Ratliff, testified about how all three asserted patents have a

11 remaining life of more than a dozen years.  This means that if

12 CosMX continues to use ATL's patented technology, it will

13 continue to pay ATL a royalty even after this case is over,

14 and they will do so for as long as they use ATL's patented

15 technology.  Should CosMX in the future decide to stop using

16 that technology, they will be able to stop paying the royalty.

17     Next slide, please.

18     You might recall Mr. Ratliff giving you the analogy of

19 paying rent on your apartment or home.  Rent is like a

20 royalty, he said.  You pay to use someone else's property.  So

21 if you rent your home, you pay rent while you live there.  If

22 you move, you stop paying rent.  Same thing with a running

23 royalty.

24     Next slide.

25     And Mr. Alan Ratliff told you that the amount of royalty

1 or rent due for ATL -- to ATL for CosMX's use of ATL's

2 patented technology through the end of this trial, which we

3 hope is going to be today, is $7,570,661.

4 Now, I realize this is a large amount of back rent to

5 have to pay, but remember CosMX had a chance to license the

6 patents back in June 2021 and they chose instead to continue

7 using ATL's patented technology without paying rent.  So that

8 is why the number is as big as it is now.

9 Next slide.

10 And just to put that number in context, I want to remind

11 you of the amount of sales CosMX has made since then using

12 ATL's patented technology.  Mr. Ratliff showed you this slide

13 during the trial, and he explained how he calculated that

14 CosMX has made over half a billion dollars by selling battery

15 products that use ATL's patents.

16 And he told you CosMX's profit margin on those sales is .

17 , which is substantially higher than the margin

18 CosMX gets on non-infringing battery products that it also

19 sells.  And, of course, as we heard during the trial on cross

20 examination from CosMX's damages expert, Mr. Schoettelkotte,

21 CosMX did not bother to calculate an alternative sales royalty

22 base and ultimately ended up using the same sales number that

23 Mr. Ratliff did to calculate its alternative running royalty.

24 So Mr. Ratliff is the only one -- Mr. Ratliff's is the

25 only one you have and the only one you should use in

1   considering what the reasonable royalty should be in this

2   case.

3       Mr. Fisher, if we could jump to the end here at 2.14.

4       In view of all this, ladies and gentlemen, ATL that you

5   find CosMX infringed the '987, the '363, and the '352 Patents

6   and that all three patents are valid.  And in response to this

7   question as to what sum of running royalty do you find ATL has

8   proven it is entitled to through today, we ask that you write

9   in, $7,570,661.

10      Now, let's talk about some invalidity issues that came up

11  during Mr. Ivey's presentation, and a couple of issues up

12  front.

13      First, the DP018/SW-E7/DP060 issue, you know, the Defense

14  here is trying to suggest that we accused a prior art product

15  infringement.  That's just not true.  What we learned during

16  trial is that CosMX's lawyers made a mistake, they gave us the

17  wrong information.  Now they're trying to capitalize on that

18  wrong information and create an escape hatch.  Don't let them

19  get away with it.

20      Dp018 is not DP060.  We accused DP060, not DP018.  We

21  know those aren't the same because Dr. Suli Li testified here

22  in court that when they assign a number to an electrolyte,

23  it's different.  So there is no way that DP018 can be DP060.

24  I want that to be clear.

25      Secondly, you heard Mr. Ivey say yet again that they

1   weren't in the room during patent prosecution, they

2   didn't -- the Patent Office didn't consider the prior art.

3   Well, let's remember what happened here in trial.  Doctor

4   Lucht admitted on cross examination that each of Ueki, Wang,

5   and Deng was considered by the Patent Office in a further

6   proceeding on the '987 and '352 Patents.

7        Also, as you heard during trial, the U.S. Patent Office

8   does accept prior art submissions from any interested person

9   during prosecution.  So CosMX could have submitted all of its

10  prior art to the Patent Office during the prosecution of all

11  three patents.  And that's true for all eight references.

12  Ueki, iPod Touch 6, Samsung S9, DP018, SW-E7, Zeng, Wang,

13  Deng, all of those could have been submitted during the

14  original prosecution of these patents, had CosMX chosen to do

15  so.

16       Now, let's go to my first slide in the invalidity

17  section.  I think it's 12.6, Mr. Fisher.

18       During trial, CosMX claimed that Ueki anticipates claim 1

19  of the '987 Patent.  However, I'm hoping that you were all

20  listening closely to the Court's instructions.  You see,

21  anticipation requires that a single prior art reference

22  disclose not only each element of the claim but that it also

23  enable one of skill in the art to practice the full scope of

24  the invention without undue experimentation.

25       We heard in the trial about chemistry labs and two hours

1  of lab experiments, an hour of math.  That is undue

2  experimentation, ladies and gentlemen.

3  Now, for the '987 Patent, CosMX never presented evidence

4  that Ueki enabled the full scope of claims 1 or 17.  This is

5  because Doctor Lucht never analyzed this question.  Doctor

6  Lucht completely overlooked it.

7  And, of course, on cross examination, I was able to get

8  Doctor Lucht to acknowledge that Ueki does not teach the full

9  scope of claim 1 of the '987 Patent.  In particular, Ueki does

10  not teach the quotient of Dv90 to the inorganic particles over

11  the thickness of the porous layer.  And we know that is

12  one-half of that last element on this chart, which I've

13  modified.  This was Defendant's chart in trial.  I've put an X

14  where it needs to be which is they can't meet that element

15  ratio Dv90 of the inorganic particles to the thickness of the

16  porous layer.  It's not there; it's not enabled.

17  Now, Ueki also fails to teach the other component there,

18  the range of .3 to 3.0, that the quotient falls in that range.

19  That's not in Ueki nowhere, and it doesn't teach you that

20  that's an important range.  So don't be swayed.  Ueki doesn't

21  anticipate the '987 Patent.

22  Now let's goes to next slide, the iPod Touch 6.  Now,

23  CosMX also claimed that the iPod Touch 6 anticipates both

24  claims here.  Actually, I correct myself.  Ueki, they don't

25  even assert against claim 17, so that claim survives over Ueki

1   without any dispute.

2        Now, the iPod Touch 6, they do assert against both claims

3   1 and 17.  But, here again, the prior art simply does not

4   teach all the elements of claim 1 and 17.  Just like Ueki,

5   they don't teach the quotient of Dv90 of the inorganic

6   particles over the thickness of the porous layer.  How could

7   it?  It's just a battery and a product.  It doesn't have

8   instruction guides that teach you about the separators that

9   are used in -- in -- in the battery.  It doesn't have any of

10  that.  So this is not an enabling piece of prior art.  It

11  cannot anticipate either claim of the '987 Patent.

12       So it also doesn't teach the range, .3 to 3.0.  How could

13  it?  How could a product teach you what the important range is

14  for the Dv90 quotient?  It can't do it and it doesn't do it

15  and don't be swayed.

16       Now, there is an additional problem with the iPod Touch 6

17  battery.  CosMX has failed to carry its clear and convincing

18  burden to establish that the iPod Touch 6 is even prior art.

19       First, they failed to do sufficient evidence to show that

20  the device was actually the same as it was when it was first

21  sold six years ago.  And they have to show it's the same as it

22  was when it was first sold because that's the triggering point

23  for prior art.  They didn't even show it was a commercial

24  sale.  Maybe it was an experimental sale to -- to someone else

25  who was going to run experiments on it.  They didn't provide

1   any evidence of that.  They just assume it.

2       And they didn't say it was ready for patenting to get to

3   these claims which are very specific with the Dv90 quotient to

4   the thickness of the porous layer.  This product doesn't say

5   that it could patent that at that time.  There's nothing

6   there.  So despite what CosMX says, the iPod Touch 6 cannot be

7   qualified as prior art.  And even if it could, it simply could

8   not anticipate the '987 Patent.

9           THE COURT:  Ten minutes remain.

10          MR. IVEY:  All right.  Let's skip over the next

11  slide and go to the Zeng reference.

12      During trial, CosMX claimed that Zeng anticipates claim 1

13  of the '363 Patent.  However, CosMX never presented evidence

14  that Zeng enabled the full scope of any claim -- of claim 1 of

15  the '363 Patent.  And, in fact, Zeng failed to teach the

16  propyl propionate weight percentage.  That's a key component

17  of this patent--didn't teach it.

18      Here again, Lucht never analyzed whether Zeng enabled the

19  full scope of the claim.  He completely overlooked that step.

20  And Zeng, like we saw for the '987, here Zeng doesn't teach

21  the specific formula.  There is no teaching of X plus Y, which

22  is dinitriles and trinitriles.  There's no teaching of X

23  divided by Y, and there's no teaching of Y divided by Z, which

24  is trinitriles divided by propyl propionate.  These formulas

25  cannot be found in Zeng.  I urge you to read it; you will not

1    find them.

2         You know where you also won't find them?  In the Samsung

3    S9, which is the other prior art reference that they're

4    asserting.  So we jump ahead to that.  You won't find these

5    formula in the product.  How could you?  The product

6    documentation, which we don't have, isn't going to tell you

7    and certainly you're not going to find it printed on battery.

8    It doesn't show this formula.  It cannot anticipate.

9         That goes equally -- next slide -- for the DP018 and

10   SW-E7 electrolytes.  These are emails.  They are not even

11   commercial offers.  That most likely was testing.  So they

12   haven't met that threshold.  They don't show it was ready for

13   patenting.  They certainly don't show how the email taught the

14   formula in the '363 Patent.  Right?  There's no X plus Y, X

15   divided by Y, Y divided by Z.  You won't find that in the

16   emails because it's not there.  And so you also should not be

17   swayed by that evidence.  It does not enable the full scope of

18   the claims.

19        Finally we get to the '352 Patent.  We looked at Wang.

20   They acknowledge Wang does not have the notch, so that's not a

21   piece of prior art that is entitled to that much credit.  So

22   they try and combine it with Deng, but, of course, Deng on its

23   own didn't have the notch groove, so that piece of prior art

24   on its own is also deficient.

25        If we go to the next slide just to summarize.

1    Cosmx instead said that it was the combination of these

2    two that rendered the patent obvious.

3        As a threshold matter similar to Zeng above, CosMX failed

4    to present evidence sufficient to establish Wang and Deng were

5    actually printed publications which would qualify it as prior

6    art in the first place.  We heard testimony Doctor Lucht

7    didn't even know how he got them, didn't know if it was

8    published, didn't know if it was available to U.S. citizens,

9    didn't know if it was in English.  There were all kinds of

10   problems with these pending Chinese patent applications.

11   Because of that, they didn't meet their burden of proof of

12   clear and convincing evidence.

13       In addition, CosMX failed to adduce evidence establishing

14   that the reference -- Deng reference is pertinent or analogous

15   art.  They're required to do that.  We learned that Deng

16   teaches a notch for curtailing deformation.  The '352 was to

17   eliminate burrs.  Those aren't even related.  These two things

18   should not be combined.

19       Okay.  Let's leave invalidity.  And I'm sorry I'm going

20   too fast, but I do feel I'm pressed for a bit of time here.

21       Now, go to -- we are going to start here at 12.1,

22   Mr. Fisher.

23       Ladies and gentlemen, I said in my opening statement

24   that CosMX is and even celebrates that it is a low-cost

25   provider of lithium-ion batteries.  Well, you say -- you saw

1  yourselves that CosMX did just that during the trial.

2  Mr. Alex Li, VP of legal -- patent and legal affairs of CosMX

3  testified under oath that CosMX tries to get to market quicker

4  with batteries that are comparable in performance but they do

5  it for cheaper.  Now, ladies and gentlemen, think about it.

6  How do they do that?  How do they achieve the same level of

7  technology at a cheaper price?  The answer is obvious--by

8  imitating ATL.  By imitating ATL, CosMX does not have to

9  invest in R&D, and the elimination of that significant expense

10 is why they can charge less for the same level of performance.

11      Next slide.

12      You heard from Doctor Maness that -- on cross examination

13 that CosMX has far fewer patents than its competitors do.

14      Next slide.

15      And you'll recall Dr. Suli Li, who testified live, she

16 could not even confirm or deny whether CosMX had even 10

17 United States patents.  You heard testimony from Mr. Lam that

18 ATL has almost 300.

19      Only one inference can be drawn from all of these facts

20 now proven and rebutted, namely that CosMX simply does not

21 invest in developing the incremental improvements in battery

22 performance that the top brand customers like

23            and      demand in their products.

24      So how does CosMX imitate ATL's technology?

25      Next slide.

1    THE COURT:  Five minutes remaining.

2    MR. POWELL:  First, they target hiring ATL's top

3    engineers by offering them stock compensation.  As you heard

4    from the former senior engineer Dr. Suli Li, who testified

5    live, CosMX offered her millions of R&B in stock to jump ship

6    from ATL to CosMX.  And you heard Joe Lam explain that ATL as

7    a subsidiary of TDK cannot offer stock options to its

8    employees, so the Defendant here is taking advantage of that

9    limitation.

10   Now, this is why today over half of CosMX's pending

11   patent applications and patents have at least one former ATL

12   engineer as an inventor.  This is just astonishing, ladies and

13   gentlemen.  More than half of CosMX patent filings would not

14   exist if it were not for ATL-trained engineers.  It is also

15   why CosMX is able to file look-alike patents that in some

16   instances are nearly verbatim to what is in ATL's patents.

17   You'll recall that this -- Dr. Suli Li, who was also head of

18   electrolytes at CosMX, was one of the named inventors on the

19   Dv90 look-alike patent.

20   Now, we jump forward to senior engineer in charge of

21   reverse engineering Mr. Meng Cao, who also testified by

22   deposition.  This is -- he reversed engineers ATL's products.

23   That's the other way they imitate.  He even admitted that they

24   specifically look for the ratios in ATL's '363 electrolyte

25   patent.  That fact -- the fact that they analyzed the ratios

1   in ATL's patents proves CosMX knows about the '363 Patent and

2   that renders CosMX's infringement of this patent willful.

3        Now, in the interest of time I'm going to skip ahead to

4   another point here.

5        Let's go to the 12.2, Mr. Fisher.

6        And I'm just going to summarize the infringement case

7   again.

8        The '987 separator invention --

9        Can you get there, Mr. Fisher?

10       The separator invention where ATL's engineers discovered

11  that optimizing the ratio of Dv90 over inorganic particles to

12  the thickness of the porous layer, ATL presented substantial

13  evidence of infringement.  CosMX has no evidence to rebut

14  Doctor Hayes.  They didn't do any analysis themselves.

15       The same is true for the '363 Patent.

16       The same is also true, of course, for the '352 Patent.

17  We had substantial evidence of infringement.  They didn't have

18  any of their own evidence to show non-infringement.

19       If we could jump to the final slide here, which is going

20  to be 12.9, Mr. Fisher.

21       The verdict form.  And sorry the slides were a little

22  delayed there, ladies and gentlemen.

23       In conclusion, I ask that you find in favor of my client

24  ATL and against CosMX and check the box "yes" for infringement

25  of each patent.  Also check the box "yes" for willful

1    infringement.

2        Then I also ask that you when you proceed to validity

3    that you check the box "no" for each asserted claim, thereby

4    confirming that the innovations of these three patents are

5    entitled to patent protection.

6        And the next slide, finally, I ask that on the verdict

7    form when it asks you for the reasonable running royalty, that

8    you put there $7,570,661.

9        And if there's any time left, I yield it to Mr. Wolfson.

10            THE COURT:  There's a little bit.

11            MR. WOLFSON:  I will be brief.

12        Ladies and gentlemen, in Mr. Ivey's final closing

13    arguments he didn't really respond to all the points I made to

14    you about the free speech burden that they have to meet by

15    clear and convincing evidence, the failure to prove an actual

16    harm to competition, failure to prove an actual harm to CosMX.

17        When you get to Question No. 5 today, that is the free

18    speech question, have they proven by clear and convincing

19    evidence that the assertion of the patents in China was

20    objectively baseless and subjectively motivated to interfere

21    with their business, all you have to do is check "no."  And

22    then if you check "no," that's it on the antitrust claims.

23        If you are able to get past the clear and convincing --

24    well, if they are able to get past the clear and convincing

25    burden that they bear on that question, then all the rest of

1  the questions, for all the reasons that I mentioned to

2  you--inability to show specific intent to monopolize,

3  inability to show dangerous probability of monopolization,

4  inability to show that this case should even be in the United

5  States--it's just "no," "no," "no," to all the questions

6  No. 6.

7       Thank you.

8            THE COURT:  All right, ladies and gentlemen, you've

9  now heard closing arguments from counsel for the competing

10 parties.  I have just a few short additional instructions

11 before I direct you to retire and consider your verdict.

12      You must perform your duty as jurors without bias or

13 prejudice as to any party.  The law does not permit you to be

14 controlled by sympathy, prejudice, or public opinion.  All

15 parties expect that you will carefully and impartially

16 consider all the evidence, follow the law as I have given it

17 to you, and reach a just verdict regardless of the

18 consequences.

19      Answer each question in the verdict form based on the

20 facts as you find them to be, following the instructions that

21 the Court has given you on the law.  Again, do not decide who

22 you think should win this case and answer the questions to

23 reach that result.  And I'll remind you once more, your

24 answers to the questions in the verdict form must be

25 unanimous.

1    You should consider and decide this case as a dispute

2  between persons of equal standing in the community of equal

3  worth and holding the same or similar stations in life.  This

4  is true in patent cases between corporations, partnerships, or

5  even individuals.  A patent owner is entitled to protect its

6  rights under the laws of the United States.  The law

7  recognizes no distinction among types of parties, and all

8  corporations, partnerships, other business organizations all

9  stand equal before the law, regardless of their size,

10  regardless of where they come from, and they are to be treated

11  as equals.

12    Now, when you retire to the jury room to deliberate on

13  your verdict, as I've told you, you're each going to have your

14  own printed copy of the instructions I've given you today, the

15  Court's charge to the jury.  During your deliberations if you

16  desire to review any of the exhibits which have been shown to

17  you during the trial and which the Court has admitted into

18  evidence, then you should send me a written note signed by

19  your foreperson requesting that exhibit or those exhibits, and

20  if you do, I will send that exhibit or those exhibits to you.

21    Once you retire, you should first select your foreperson

22  and then conduct your deliberations.  After you've reached a

23  unanimous decision as to all the questions in the verdict

24  form, your foreperson should complete the form reflecting

25  those unanimous decisions, sign it, and date it on the last

1  page, and then notify the Court Security Officer that you've

2  reached a verdict.

3  Do not reveal your answers on any question unless

4  instructed to do so, and you must never reveal to anyone,

5  not even to me, your division -- your numerical division on

6  any unanswered question.

7  Any notes that you've taken over the course of this

8  trial, ladies and gentlemen, are aids to your memory only.

9  You have to rely on your memory of the evidence, and your

10  notes, if you took any, are simply to refresh your

11  recollection of the evidence over the course of the trial.  A

12  juror who has not taken notes must rely on his or her memory

13  and their own independent recollection of the evidence and

14  should not be unduly influenced by the notes of other jurors.

15  Notes are not entitled to any greater weight than the

16  recollection or impression that each juror had about the

17  testimony.

18  Now, during your deliberations if you want to communicate

19  with me at any time, you should give a written message or

20  question signed by your foreperson to the Court Security

21  Officer who will bring it to me.  I'll then respond as

22  promptly as possible either by responding in writing to you or

23  by having you brought back into the courtroom where I can

24  address you orally.  And I will always first disclose to the

25  attorneys in the case your question and my intended response

1 before I answer any question you might send me.

2     Now, after you've reached a verdict and the Court has

3 accepted your verdict and discharged you as jurors, I want you

4 to understand at that point you will not be required to talk

5 with anyone about the case unless you choose to. But you will

6 also at that same point be completely free to talk about your

7 experience as jurors if you choose to. That decision at that

8 time will be completely 100 percent your decision and yours

9 alone; nobody else's.

10     I'm now going to hand eight printed copies of the Court's

11 final jury instructions and one clean copy of the verdict form

12 to the Court Security Officer who will deliver them to you in

13 the jury room.

14     Ladies and gentlemen of the jury, you may now retire and

15 deliberate on your verdict. We await your decision.

16         (Whereupon, the jury left the courtroom.)

17         THE COURT: Be seated, please.

18     Counsel, you are welcome to wait here in the courtroom

19 while the jury deliberates. You are welcome to leave a

20 representative here in the courtroom while the jury

21 deliberates. You are also welcome to be off premises, but I

22 don't want you to go far. I don't want you to get scattered

23 and I want you to be available to be recalled promptly in the

24 event I get a question from the jury or at the time they

25 return the verdict. We have I believe cell phone numbers for

1    a representative from each side.  Keep those phones close

2    because if we call, we expect you to come.

3        Awaiting either a note from the jury or the return of

4    their unanimous verdict, Court stands in recess.

5                    (Jury deliberates.)

6            THE COURT:  Be seated, please.

7        Counsel, I've received the following note from the jury.

8    I'll read it into the record, I'll mark it for identification,

9    and then I'll deliver the original note to the Courtroom

10   Deputy.  The jury's note reads as follows:  "Can a claim be

11   both infringed upon per the claim items and found invalid in

12   the later question?"  And it's signed by Juror No. 1,

13   Ms. McAnear, as foreperson.

14       I'm going to mark it with a 1 in the upper right-hand

15   corner and I'll hand the original note to the Courtroom

16   Deputy.

17       Now, having read their question, I've prepared a written

18   response.  And if one person from each side will approach the

19   Courtroom Deputy, I'll give you a copy of what I've prepared

20   as a written response and then I'll review it with you.

21       The Court's proposed response is as follows:  "Members of

22   the jury, in response to Jury Note No. 1, as I've instructed

23   you on page 8 of the Court's charge, invalidity and

24   infringement are separate and distinct issues.  Your job is

25   to decide whether CosMX has infringed the asserted claims and

1  where those claims are invalid.

2      "The instructions in the verdict form make it clear in

3  the instructions at the bottom of page 4 of the verdict form

4  that you are to answer Question No. 2 regardless of how you

5  have answered questions 1a, 1b, and 1c."

6      Is there any objection from either party for me to send

7  that written response back to the jury?

8          MR. THOMPSON:  No objection from the Plaintiff, Your

9  Honor.

10         MR. IVEY:  No objection from the Defense.

11         THE COURT:  All right.  Then I will execute the

12 written response from the Court to the jury.  I'll hand one

13 executed copy to the Courtroom Deputy to be included in the

14 papers of this cause.  I'll give one executed original of this

15 written response to the Court Security Officer and direct him

16 to deliver it to the jury.

17     And with that, counsel, awaiting either another note from

18 the jury or a return of their verdict, we stand many recess.

19                 (Deliberations continue.)

20         THE COURT:  Be seated, please.

21     Counsel, I've received a second and a third note from the

22 jury.  I will read the two, and I have a copy for each side

23 that you can approach and get from the Courtroom Deputy after

24 I've read them.

25     Note No. 2, which I've marked with a 2 in the upper

1  right-hand corner for identification, says, "May we see the

2  demonstrative exhibits for Patent '352, claim 1?"

3      The second note, which I got shortly thereafter -- the

4  third note, rather, that I got shortly thereafter, which I

5  marked with a 3 in the upper right-hand corner for

6  identification, says, "May we see the testimony of Mr. Lewis

7  Hruska and Mr. Peipei Guo in reference to the '352 Patent?"

8      If you would like this, I have a printed copy of these

9  two notes.  You can approach and get a copy for each side from

10  the Courtroom Deputy.  And I'll hand the original notes to the

11  Courtroom Deputy for inclusion in this case.

12      I have prepared a response which I'd like to go over with

13  you and then I'll see if there are any objections to it.

14      The Court's proposed response is as follows:  "Response

15  to Jury Note No. 2 and No. 3.

16      "Members of the jury, in response to Jury Note No. 2, as

17  I have instructed you previously, the demonstrative exhibits,

18  sometimes simply called demonstratives, are not evidence and

19  cannot be reviewed by you during your deliberations, but a

20  witness' testimony given with the aid of a demonstrative is

21  evidence.

22      "Demonstratives for Plaintiff are typically marked PDX,

23  meaning Plaintiff's Demonstrative Exhibit, and for Defendant

24  as DDX, meaning Defendant's Demonstrative Exhibit.  Actual

25  exhibits designated by the Court are typically marked as PTX

1  and DDX, meaning Plaintiff's Trial Exhibit and Defendant's

2  Trial Exhibit.  In some cases an exhibit is jointly submitted

3  by both parties, and those are typically marked JTX, meaning

4  Joint Trial Exhibit."

5  "Response to Juror Note No. 3.

6  "I cannot send you, 'the testimony' of any witness.  You

7  must rely on your memories of the testimony of each witness.

8  The written transcript of what was said during the trial is

9  not available to send to you.  It is prepared in case there is

10  an appeal from this court to an appellate court.  You have to

11  rely on your own memories of the testimony of the witnesses.

12  Any notes you may have taken are to refresh your memories and

13  recollection of the witness' testimony."

14  Are there any objections from either party to me sending

15  that written response to these two notes back to the jury?

16  MR. THOMPSON:  No objection from Plaintiff, Your

17  Honor.

18  MR. IVEY:  No objection from Defense.

19  THE COURT:  All right.  Then I will execute the

20  written version of that responsive note, I'll hand it to the

21  Court Security Officer, and direct him to deliver it to the

22  jury.  I will also execute a duplicate of that written

23  response which I will hand to the Courtroom Deputy to be

24  included in the papers of this case.

25  All right, counsel.  Stay tuned.  Awaiting either another

1    note or return of a verdict, we stand in recess.

2                          (Deliberations continue.)

3                          (Jury left for the day.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts          02/08/2024

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25